2020 IL App (1st) 182533

FIRST DISTRICT
SIXTH DIVISION
October 23, 2020

No. 1-18-2533

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 11698 |
| | ) | |
| DEMONTE CLARK, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Connors concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Demonte Clark, appeals his convictions of attempted first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm and his sentence of 18 years' imprisonment. Defendant was 15 years old when the crimes occurred. On appeal, defendant contends he was denied a fair trial where (1) the trial court improperly allowed testimony that defense counsel harassed witnesses and pretended to be an investigator and the prosecutor's improper comments in closing argument exacerbated the error and (2) the trial court improperly allowed testimony that implied defendant had been arrested for prior crimes. Defendant also contends that his sentence should be vacated and the cause remanded for a hearing pursuant to section 5-130(1)(c)(ii) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-130(1)(c)(ii) (West 2016)), where the Act's 2016 amendments raising the automatic transfer age from 15 to 16

years old took effect more than a year before he was sentenced. For the following reasons, we affirm defendant's convictions but vacate his sentence and remand for further proceedings.

¶ 2                                    I. JURISDICTION

¶ 3     The trial court sentenced defendant on November 1, 2017. Defendant filed a notice of appeal on November 30, 2017. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                    II. BACKGROUND

¶ 5     Defendant was charged as an adult with attempted first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm, in a shooting incident that injured Jamar Slatton. Prior to trial, the prosecutor informed the court that a person had come to Jamar's house and indicated to Jamar and his father, Jymil Coats, that he was there to represent Jamar. After they spoke with him, the person told Jamar and Coats that he worked for defendant. The prosecutor also stated that witness Latasha Moore was repeatedly contacted by an investigator and she changed her phone number in order to stop the calls. The prosecutor asked counsel to inform the investigator not to harass the witnesses and that, if he wished to speak with the witnesses, they would be made available. Defense counsel assured the court that his investigators were licensed and followed ethics rules. Although he disagreed with the prosecutor's representations, counsel would "make sure that everything is appropriate."

¶ 6     During jury selection, the prosecutor informed the court that, when they arrived that morning, Jamar and Coats saw defense counsel and identified him as the "investigator" who had

previously spoken to them. The prosecutor continued, "If there is some kind of line of questioning from those witnesses when they testify about their other conversation that was had, they would say that it was counsel who came and spoke to them, not these two people that are listed on this report." It had been disclosed in discovery that defense counsel used the services of investigators Charles Foster and Lawrence Moore. The prosecutor wanted defense counsel "to be aware that they would say that this is a lie and that counsel actually was the person that was there and he's representing the defendant." Defense counsel stated that he was "flattered" that Jamar and Coats thought he looked like Charles Foster, but counsel "wasn't there." The trial court accepted defense counsel's representation that he was not the person who spoke with Jamar and Coats at their house. The next day, defense counsel amended discovery to show that the other investigator with Foster was Lauren Moore, not Lawrence Moore.

¶ 7     At trial, Jamar testified that on the night of May 27, 2012, he and his twin brother Lamar were hanging out with their friend, Daja Moore, on the front porch of Jamar's house at 255 West 104th Street in Chicago. He was 17 years old at the time. Jamar and Daja sat on the porch steps, and Lamar was standing behind them. Across the street from Jamar's house was Langston Hughes Elementary School. Jamar testified that the street was lit by newly installed streetlights. Jamar's house was near the intersection of Princeton Avenue and 104th Street, and he noticed "a group of guys riding down Princeton on bikes" toward 104th Street. Jamar testified that he recognized Eric Ross, Jeremiah Chambers, and defendant in the group. Jamar knew them because they had gone to Langston Hughes together and defendant had played basketball with him in the past. Jamar testified that he could clearly see defendant's face.

¶ 8    Jamar saw the group turn westbound on 104th Street, and defendant made eye contact with Jamar's group. The guys on bikes then rode into an alley. Jamar lost sight of them for a few minutes when they went into the alley, but he saw them again when they came out of the alley onto Princeton. Jamar saw defendant and another person he did not know get off their bikes. They both had guns. Defendant pointed his gun at Jamar, Lamar, and Daja, and started shooting. Jamar could see defendant because "[t]he light was right up under him" and nothing obstructed his view. Jamar knew it was defendant who shot the gun because he saw "sparks" and "fire shooting out of" defendant's gun. Jamar testified that he heard "two different gun sounds."

¶ 9    Jamar tried to open the front door, but it was locked. Jamar ran in the direction he had seen Lamar and Daja run and found them behind his house near 103rd and Princeton. He returned home and felt a "burning" in the calf of his right leg. He looked down and saw that he was bleeding and there were two holes in his leg.

¶ 10    Latasha Moore, Daja's mother, drove Jamar, Lamar, and their grandmother to the hospital. Jamar testified that he did not have a "medical card," but his brother Lamar had one. At the hospital, Jamar said that he was Lamar so he could get medical treatment. While being treated, Jamar spoke with police and he gave them defendant's name as the shooter. He also described defendant's clothes and that "[h]e had little twistees," which was a hairstyle different from the others riding bikes that night. Jamar was released from the hospital at 2:30 a.m. and given pain medication. When he returned home, Jamar went upstairs to relax. He spoke with another detective after he returned home, but he was under the influence of pain medication at the time. He went to sleep after the interview ended.

¶ 11    The next day, detectives came to his house, and they asked him to have Daja come over. When she arrived, Daja, Jamar, and Lamar were placed in separate rooms. While they were separated, Jamar again identified defendant as the shooter, but he did not give a description of the other person with the gun because he did not know him. Jamar was shown a photo array in which he identified defendant as the shooter. He stated that defendant's hair was different in the photo from how it appeared on the night of the shooting. When Jamar signed the photo array, he started to use a "J," but then signed "Lamar" because he had used his brother's name at the hospital.

¶ 12    The following day, Jamar went to the police station to view a lineup and he told police he was Jamar. He signed a lineup advisory form with his actual name, and Jamar identified defendant as the shooter in the physical lineup. He testified that neither he nor Lamar nor Daja had weapons on the night of the shooting. Jamar stated that he observed defendant for about 30 seconds when he first saw him riding his bike but that the time in which the shooting incident occurred was brief.

¶ 13    On cross-examination, Jamar stated that the other person with a gun was taller than defendant, but he did not remember what he wore. He stated that, although he saw the other person with a gun, he never told anyone that the person was shooting. Jamar testified that defendant and the other person with a gun got off their bikes. They were at the "mouth of the alley" when the shooting occurred. As he, Lamar, and Daja walked back to his house after the shooting, he heard Daja's mother calling for her. Daja, who lived about five houses away, walked home.

¶ 14    Defense counsel questioned Jamar about his treatment at the hospital and his use of Lamar's medical card. He also asked about the police officer Jamar spoke to at the hospital. The following exchange occurred:

"Q. Okay. You told that officer the same lie about your name at that time, is that correct?

A. Yes.

Q. So you were worried that the false name would be—the police would have something to do with you using a false name?

A. No.

Q. You just chose to tell an untruth to the police?

A. Yes."

Jamar denied that he told the first detective who came to his house that a group of people walked "past (his) location." He told the detective that two people had guns that night and one of them was defendant, who wore a red shirt and dark blue jeans.

¶ 15    Defense counsel then asked Jamar about his identification of defendant in the photo array. Counsel asked Jamar about his signature.

"Q. And you initially had wrote a J and signed your name, correct?

A. Yes.

Q. And then you went back and crossed the J out and wrote an L over the top, right?

A. Yes.

Q. Who all knew that you were lying about your identity?

A. Me, my brother, my daddy, my grandmother.

Q. And nobody told you that that was a bad idea to be lying about what happened?

A. No.

Q. After you were scared about the medical treatment, the medical card issue, why did you maintain lying about your identity?

A. Because when the officers came to the hospital, they knew me as Lamar."

¶ 16 Continuing his cross-examination of Jamar, defense counsel asked him about an investigator and a woman who came to his house to interview him. Jamar stated that at the time he, Lamar, and his father were home. When asked whether he told the investigator that he never saw defendant get off his bike during the shooting, Jamar answered, "No, I never told the investigator that." He also denied that he told the investigator that he saw defendant fire a shot but that he was still on his bike. He denied he told the investigator that he never saw defendant get off his bike. Defense counsel asked Jamar if anyone else had interviewed him about the incident, and the following exchanged occurred:

"WITNESS: The people that interviewed me was the officers, police officers, who else came, and the investigator and that young lady. The investigator came, he knocked on the door. He was like—

DEFENSE ATTORNEY: Judge, no question pending.

THE COURT: Okay."

Defense counsel informed the court that he had no further questions for the witness.

¶ 17 On redirect examination, the prosecutor questioned Jamar:

"Q. Okay. Now, counsel has asked you some questions about an investigator coming to talk to you. Do you remember those questions?

A. Yes.

Q. And this was a few months after you had been shot, correct?

A. Yes.

* * *

Q. And when that person came to your house, did that investigator identify themselves as Charles Foster and Lawrence Moore?

A. I don't remember what they say they [*sic*] names was.

Q. One of them was a woman though, correct?

A. Yes, it was a woman and a male.

Q. And one was a male.

Do you see the male investigator in the courtroom today?

A. Yes.

Q. Can you point to him and identify something that he might be wearing?

A. He's right over there with that suit and purple tie on.

Q. The attorney who was just asking you questions?

A. Yes.

Q. So he actually came to your house, correct?

A. Yes.

Q. It wasn't somebody who said that he worked for the Defendant's attorney, it was actually the Defendant's attorney, is that right?

A. Yes."

¶ 18    Jamar agreed that during that interview the investigator showed him his handwritten statement to the assistant state's attorney, and Jamar agreed to speak to him about the statement. Jamar testified that, as he was speaking, a woman was "writing stuff down." Jamar did not see the

notes she was taking, nor did he sign off on the accuracy of what was written. At the end of their conversation, the investigator informed Jamar that he was defendant's attorney, and Coats, Jamar's father, asked him to leave.

¶ 19    Jamar stated on redirect examination that he told the detective who came to his house that defendant got off his bike before shooting. In his statement to the assistant state's attorney, Jamar stated that he saw defendant and another boy "get off their bikes and pull out guns." At a preliminary hearing, Jamar identified defendant as the shooter, and when asked whether defendant was "still on his bike or [on] foot" Jamar answered, "No, they hopped off the bike."

¶ 20    On recross-examination, defense counsel questioned Jamar:

"DEFENSE ATTORNEY: Are you absolutely [sure] that I'm the person that came to your house on January 16 of 2013?

WITNESS: Yes, sir.

DEFENSE ATTORNEY: And it was my height, and my weight, and my description?

WITNESS: Yes, sir.

DEFENSE ATTORNEY: Nothing further, Judge. Thank you.

THE COURT: All right. Thank you. You are excused."

Outside the presence of the jury, the following exchanged occurred:

"THE COURT: We got a big problem. We've got a big problem in the sense that the witness has identified you as being the investigator that went to the house.

DEFENSE ATTORNEY: Yes.

THE COURT: Under some other name.

DEFENSE ATTORNEY: Yes.

THE COURT: Okay. Now we dealt with that before and you told me absolutely that you were not the person, is that correct?

DEFENSE ATTORNEY: I'm positive, Judge.

THE COURT: All right. Now the only thing I'm saying is, are you going to call as a witness the person that was there?

DEFENSE ATTORNEY: Yes.

THE COURT: Okay. Because otherwise you've got a problem.

DEFENSE ATTORNEY: You betcha.

THE COURT: Okay. All right. And I'm satisfied with that as far as proceeding, but that is a problem.

DEFENSE ATTORNEY: It's a big problem, Judge. I understand that. I have never had the situation occur. The investigator that I use, if I could, is a large man. He is a large black man.

THE COURT: As long as your representation to the court as an officer of the court that his testimony is mistaken as far as your identification as being the witness and you're going to bring him in as a witness to show that, I'm fine with that.

DEFENSE ATTORNEY: Yes.

THE COURT: I'm fine with that.

DEFENSE ATTORNEY: Thank you.

THE COURT: Then it's just an issue of witness credibility, but anything other than that, we've got a major issue.

DEFENSE ATTORNEY: Judge, I wouldn't represent anywise, any untruth.

THE COURT: Okay. All right."

¶ 21 The trial resumed, and the State called Lamar Slatton and Daja Moore as witnesses. Both testified similarly to Jamar regarding the events leading up to the shooting. They recognized defendant as one of the group of boys on bikes, and both testified that they had known defendant from school. They stated that they saw defendant and one other person get off their bikes at the mouth of the alley at Princeton and that defendant pointed a gun at them and began firing. When the shooting occurred, Lamar and Daja jumped over the railing of the porch and ran behind the house. As they walked back to Lamar's house, they met up with Jamar. Lamar stated that Jamar used Lamar's medical card so he could be treated at the hospital.

¶ 22 Lamar and Daja separately viewed a photo array on May 29, 2012, and each identified defendant as the shooter. They identified Chambers as with the group, but they did not see him with a gun. They also separately viewed a physical lineup at the police station, and both identified defendant as the person who fired a gun at them.

¶ 23 Chicago police evidence technician Philip Rider testified that he recovered four .25-caliber cartridge cases at the mouth of the alley and one 9-mm Luger cartridge case on the corner of 258 W. 104th Street. He inventoried the cases and photographed the scene. He observed two bullet holes in the side of the house at 255 W. 104th Street, but he could not recover the bullet that had penetrated the siding of the house.

¶ 24 Chicago police detective Peter Muhney testified that on May 29, 2012, he was investigating the shooting and reviewed the case report naming and describing three suspects: defendant, Jeremiah Chambers, and Eric Ross. Detective Muhney testified that he went to the computer database to look for photographs of the suspects. He found photos of defendant and Chambers, but

when asked whether he was able to locate a photo of Ross, Detective Muhney answered, "No, I wasn't." The following exchange occurred:

"PROSECUTOR: And why is that?

WITNESS: He wasn't in your [*sic*] computer system. He had not been arrested as of yet.

DEFENSE ATTORNEY: Objection, Judge.

THE COURT: The objection is sustained. That answer is stricken and the jury is not to consider that answer. All right."

Detective Muhney and his partner went to Jamar's house and spoke to him, although at the time he thought Jamar was Lamar. He also spoke separately to Lamar, whom he thought was Jamar at the time, and Daja. He separately showed each of them the photo arrays. Jamar, Lamar, and Daja identified defendant as the shooter and Chambers as being with defendant but not possessing a weapon. Detective Muhney issued an investigative alert for defendant.

¶ 25    After he learned of defendant's arrest, Detective Muhney returned to Jamar's house and arranged for Jamar, Lamar, and Daja to come to the police station to view a physical lineup. While at the house, he learned Jamar's real name and that Jamar had used his brother's name to get treatment at the hospital. After learning Jamar's true identity, Detective Muhney corrected all of his general progress reports to reflect the correct names of Jamar and Lamar.

¶ 26    Jamar, Lamar, and Daja separately viewed the physical lineup, and each identified defendant as the person who fired a gun at them. They also spoke to the assistant state's attorney and gave handwritten statements.

¶ 27    On cross-examination, Detective Muhney testified that he searched for the second shooter but the information on him "was extremely vague." After speaking with Chambers, he learned that the other shooter was someone named Jeff. Detective Muhney searched for black male Jeffs in the system and found "there were tons."

¶ 28    The parties stipulated that, if called to testify, Dr. Andrew Labrador would state that on May 27, 2012, he examined and treated Lamar Slatton for a through-and-through gunshot wound to his lower right leg. The patient was given an oral antibiotic and morphine and discharged at 2:40 a.m. on May 28, 2012. Also, if called to testify, Illinois State Police firearms examiner Fred Tomasek would state that he examined the 9-mm fired cartridge case and the four .25-caliber fired cases found at the scene. He found that the 9-mm case was not fired from the same firearm as the .25-caliber cases, but the four .25-caliber cartridge cases came from the same firearm.

¶ 29    The State rested its case, and defendant filed a motion for a directed verdict, which the court denied.

¶ 30    For the defense's case, Detective Ryan Miller testified that in the early morning hours of May 28, 2012, he went to the home of the shooting victim as part of his investigation. The victim's grandmother answered the door and told him that the victim was asleep. The victim was woken up, and he spoke to the detective. He told Detective Miller that his name was Lamar. He stated that a group of boys had walked by him and two of them were wearing red shirts.

¶ 31    On cross-examination, Detective Miller stated that the victim mentioned that defendant was in the group of people that night but that he did not press the victim further "because it was 3:15 in the morning, he was tired. I just wanted him to get some sleep, and we could do a follow-

up investigation *** whenever he recuperated." On redirect examination, Detective Miller stated that he spoke to Jamar "[l]ess than five minutes."

¶ 32    Latasha Moore, Daja's mother, testified that around 10:45 p.m. on May 27, 2012, she was at her home at 317 W. 104th Street, sitting on the porch with her husband and others. She testified that new streetlights had been recently installed in the area. She saw a large group on bikes but did not recognize anyone in the group. She saw someone in the group with a white shirt who had a gun in his waistband. The group rode past her house toward the alley. The guy with the gun was taller, and he stopped his bike, stood up, pulled up his shirt and took out his gun. She described the guy as having a medium complexion, above average height, and slim. He put the gun back, and the group rode to the alley between 104th and 103rd Streets. She could not see where the alley exited at Princeton Street because houses blocked her view, but she could see the group riding "through the little cuts through the houses."

¶ 33    On cross-examination, Moore testified that she heard gunshots and saw the light from the gun being fired. The light came "from Princeton toward 104th Street." She could not see the face of the person firing the gun, but the person was wearing a dark colored shirt. She did not see the person in the white shirt firing a gun. When she heard the shots, she called for her child.

¶ 34    Jeremiah Chambers testified that he has known defendant since the fourth grade. He and Ross met with defendant on May 27, 2012, around 9:30 pm., and they rode their bikes to the park. They stopped at a gas station, and they saw a person he recognized as "Jeff." After someone in the group spoke with Jeff, they rode their bikes down Princeton to 104th Street. Chambers testified that he knew Jamar, Lamar, and Daja, but he did not see them that night. He knew where they lived, but his group did not ride past their house.

¶ 35    The group rode into the alley between 103rd and 104th Streets. When they reached the end of the alley, Chambers saw two of his friends "take off" on their bikes toward 103rd, and for the first time he saw that Jeff had a gun. When he saw the gun, Chambers and defendant "took off." Defendant was in front of Chambers, and Jeff was the last one in the alley. Chambers testified that he did not see anyone shooting but he heard gunshots. Chambers and Ross rode to Ross's house, but defendant did not ride with them. After defendant was arrested, Chambers went to the police station with his mother and spoke to detectives. He was shown five pictures "of random guys," but he did not recognize anyone.

¶ 36    On cross-examination, Chambers testified that Jeff was six feet tall and light-skinned, wearing cornrows. He had not seen Jeff before but knew his name because he had heard it "around the neighborhood." He described Jeff as wearing blue jeans and a white shirt that night, and he was riding a blue bike. Defendant was wearing a blue shirt and khakis, and he wore his hair in little twists. Chambers stated that he was wearing a red shirt and Ross wore a dark green shirt. Chambers testified that he heard four or five gunshots. He did not report the shooting to the police, but he called his mother.

¶ 37    When he later spoke with police, he did not tell them Ross was also at the scene. He denied telling police that Jeff fired in the direction of the victims. He also stated that he did not know whether there was a second shooter or a second handgun. He denied talking to defendant about the shooting since it happened.

¶ 38    Charles Foster testified that he was a retired police officer and worked as a private detective for an agency called Gilliam 300. He was hired in January 2013, and he went to Jamar's house with Lauren Moore, who was training to be a detective. When he arrived, he showed his private

detective badge and identification. Foster spoke with Jamar and Coats, but he did not audiotape the conversation. Instead, he prepared a written report summarizing the conversation. Jamar told him that he did not see defendant get off of his bike but that defendant fired as he rode away on his bike. Jamar stated that defendant and another person wore red shirts.

¶ 39    On cross-examination, Foster testified that, when he spoke to Jamar in January 2013, he told him he was working for defense counsel and that Jamar did not have to speak to him. Foster made "mental notes" during their conversation and wrote down "the date, the time, and who was present." When asked whether he still had those notes, Foster replied, "No," because he had "[t]rashed them." After speaking with Jamar, Foster wrote a report "less than a week" later and got it notarized a week or two after that. Foster did not show the report to Jamar or Coats. When shown his report, Foster acknowledged that it was notarized on May 8, 2013. He also acknowledged that the report named the person with Foster during the interview as Lawrence Moore, not Lauren Moore.

¶ 40    Foster denied that, when he first spoke with Jamar and Coats, he told them he was there on behalf of Jamar and that he wanted justice served. He denied stating that, if defendant did the shooting, he should go to jail. He denied telling Jamar and Coats at the end of the conversation that he was actually there on behalf of defendant or that he was told to leave the house.

¶ 41    On redirect examination, Foster stated that everything he wrote in his report was true and accurate as to what was told to him by Jamar that day. He also denied that he left the house in a hurry but instead "we was talking about the Lord."

¶ 42    Defendant testified that on May 27, 2012, he was 15 years old. He spent the day with his friends, including Ross and Chambers, at a family barbeque. That night, he and his friends rode

their bikes to a park and then rode down Princeton Street toward 103rd Street. Defendant saw Ross talking to a person he did not know. He did not see a gun on the person. Defendant denied seeing anyone with a gun. The group rode to 104th Street and went down an alley with no streetlights. He saw Jamar, but not Lamar or Daja. He did not say anything to Jamar.

¶ 43    Defendant was riding a little ahead of Jeff when he saw that Jeff had a small gun. Jeff was wearing a long white T-shirt and blue jeans, and he did not say anything to anyone. Ross started to speed up, and defendant also sped up. When he got to the mouth of the alley, defendant did not get off his bike. Defendant rode out of the alley and was riding fast toward 99th Street when he heard gunshots. He did not stop to check on anyone because his friends were riding close to him. Defendant did not know in what direction Jeff was shooting, and he was scared. Ross and Chambers rode toward Ross's house while defendant headed toward Wentworth. Defendant did not know someone had been shot until the police came to get him out of school a few days later. He did not see Jeff after the shooting, and defendant did not call police or tell his parents what had happened.

¶ 44    On cross-examination, defendant testified that he had never seen Jeff before that night but that he overheard someone say his name. He grew up with Jamar and Lamar and knew where they lived. Their father had coached him in basketball. Defendant stated that he had no problems with Jamar and Lamar. He testified that he heard four or five gunshots that night, but he did not know whether Jeff was shooting at him or anyone else. Defendant stated that he wore a blue shirt that night. He admitted that he wore twists in his hair and only Jeff had that same hairstyle.

¶ 45    Testifying in rebuttal for the State, Jymil Coats stated that defense counsel and a woman came to his house on January 16, 2013. He identified defense counsel in court and said counsel

introduced himself as an investigator working on behalf of Jamar. On cross-examination, when asked to describe what the investigator was wearing, Coats replied, "[a] suit like you're wearing now." Coats also described the woman with the investigator as a light-skinned, thin young lady.

¶ 46    After the court dismissed the jury for the day, defense counsel moved for a mistrial. Counsel argued that Coats's testimony attacked defense counsel's credibility in having Foster testify because counsel is "looking like [he] put somebody on that's false and that's going to be attributed to" defendant. Defense counsel continued:

> "DEFENSE ATTORNEY: And it's damaging and it's unnecessary and it's irrelevant, Judge. We brought in the investigator. I wish I would have known that that investigator was going to testify as horribly as he did. But he's the one that we hired, the family hired—
>
> THE COURT: All right. Wait. I understand that. So tell me exactly what the reason for the mistrial is. It's not inappropriate for an attorney to interview the witness in the case and for the attorney to bring in proof. The question is whether or not it was you. All right. Now and again hypothetically if it were you, what would be improper about that?
>
> DEFENSE ATTORNEY: *** The image is that we're falsifying information, Judge. They could have—the credibility of those witnesses could have been done on their own.
>
> We had no notice that they were going to come in and open the bag on this other witness, Judge.
>
> THE COURT: You knew they were calling a rebuttal witness. You knew who they were calling. And I indicated that it would be limited to as the State said, the issue of identification as to who was at the house. Now the jury can do with that what they want.

They're given an instruction that it's appropriate for an attorney to interview witnesses in the case. They're going to get an instruction on that.

DEFENSE ATTORNEY: Yes.

THE COURT: But the question is it goes to the credibility of these witnesses, it goes to the credibility of the State's witnesses, and it goes to the credibility of your witness, the investigator. And who the jury wants to decide went to the house. But it doesn't make any difference as far as interviewing a witness. That's appropriate.

DEFENSE ATTORNEY: Judge, okay—"

¶ 47    The State responded that defense counsel was on notice before jury selection that the State's witnesses would testify that counsel was the investigator who came to their house "[a]nd knowing that information he made the strategic decision to ask the victim questions about that interview ***." After hearing argument from the parties, the trial court denied the motion.

¶ 48    The jury found defendant guilty of three counts of attempted murder, one count of aggravated battery with a firearm, and two counts of aggravated discharge of a firearm. Defendant filed posttrial motions for judgment notwithstanding the verdict and for a new trial. Defendant filed a supplemental motion for a new trial based on ineffective assistance of counsel, and the trial court appointed a public defender to assist defendant in this claim. The court subsequently found no ineffective assistance of counsel, and the public defender's appearance was withdrawn.

¶ 49    On August 4, 2015, Public Act 99-258 was signed into law with an effective date of January 1, 2016. The amendment raised the automatic transfer age for a minor charged with aggravated battery with a firearm from 15 to 16 years old. See Pub. Act 99-258, § 5 (eff. Jan. 1, 2016)

(amending 705 ILCS 405/5-130). On December 16, 2015, the trial court denied defendant's motion and supplemental motion for a new trial. Defendant's sentencing hearing remained pending.

¶ 50　　On December 20, 2016, based on the supreme court's decision in *People ex rel. Alvarez v. Howard*, 2016 IL 120729, and agreement by the parties, the trial court sent defendant's case to the chief judge for remand to juvenile court. The next day, the State argued before the chief judge that it was error to remand the case and asked that it be sent back to the trial court for sentencing. The State argued that this case differed factually from *Howard*. The chief judge returned the matter to the trial court.

¶ 51　　On January 18, 2017, defendant filed a motion to remand his case to juvenile court pursuant to the amended statute. Defendant did not seek to vacate his conviction. Instead, he argued that, because he had not been sentenced and thus his case was still pending, he should be sentenced under the juvenile statute pursuant to the amendment. After argument, the trial court denied the motion, finding there was "an issue of practicability because the state [*sic*] is not being allowed to exercise a right that they have under the statute once the verdict is returned." The court further stated "that as part of the sentencing, the amendments and the statute regarding the sentencing of a juvenile in adult court, those particular factors are considered in the sentencing process." On September 27, 2017, defendant's sentencing hearing commenced, after which the trial court sentenced him to 18 years' imprisonment. The court declined to impose the discretionary enhancement because of defendant's age. Defendant filed a motion to reconsider, which the trial court denied. Defendant filed this appeal.

¶ 52　　　　　　　　　　　　　　　III. ANALYSIS

¶ 53    We first address whether defendant was denied a fair trial when the trial court allowed Jamar and Coats to testify that they believed defense counsel, not Foster, was the investigator who interviewed Jamar. Defendant argues that the testimony "intimated that the defense was lying to the jury" and that defense counsel used "ruthless tactics with victims of serious crimes." Courts have consistently condemned testimony that disparages the integrity of defense counsel, and they have found reversible error where such testimony prejudiced the defendant. *People v. Beringer*, 151 Ill. App. 3d 558, 562 (1987).

¶ 54    In *Beringer*, the prosecutor asked "unsubstantiated questions" of a defense witness, insinuating that he conspired with defense counsel to change his testimony because he blamed police for his job loss. *Id.* at 559-60. The prosecutor repeated the questioning even after an objection had been sustained by the court. *Id.* at 562. This court found that, where the questions had no basis in fact but served only to destroy the witness's credibility and impugn the integrity of defense counsel, the admission of such evidence was reversible error. *Id.* at 561-62.

¶ 55    Unlike *Beringer*, the testimony of Jamar and Coats had a factual basis and served a purpose other than to inflame the jury. The investigator's report stated that Jamar told him the shooter was still on his bike when he started shooting, which contradicted Jamar's testimony that defendant got off his bike before shooting. Foster testified that he was the investigator who interviewed Jamar and that he prepared the report. He vouched for the truthfulness of the report. Jamar, however, disagreed that he made that statement to the investigator and testified on redirect that it was defense counsel, not Foster, who came to interview him. As the trial court noted, the testimony was relevant to the credibility of Jamar and his testimony regarding the shooting, as well as to the credibility of Foster's testimony. The trial court has discretion in determining the admissibility of evidence at

trial, and a reviewing court will not disturb that determination absent an abuse of discretion. *People v. Harris*, 231 Ill. 2d 582, 588 (2008). We find no abuse of discretion here.

¶ 56    Furthermore, even if the testimony was improperly admitted, it was defense counsel who first raised the issue of the investigator before the jury. "There is no question that a defendant can open the door to the admission of evidence that, under ordinary circumstances, would be inadmissible." *Id.* During cross-examination, defense counsel questioned Jamar about the investigator who came to his home and what he said to the investigator. On redirect examination, Jamar then testified about his belief that defense counsel was the investigator. The State called Coats as a witness in rebuttal to corroborate Jamar's identification of the investigator. The State had given prior notice to defense counsel that these witnesses would so testify if counsel raised the issue of the investigator's interview with Jamar. "A defendant forfeits any issue as to the impropriety of the evidence if he procures, invites, or acquiesces in the admission of that evidence." *People v. Woods*, 214 Ill. 2d 455, 475 (2005).

¶ 57    In fact, the record shows that defense counsel raised the issue of the investigator so that he could use Jamar's interview, and his inconsistent statement, to question Jamar's credibility. This was the defense's core strategy at trial. During cross-examination, defense counsel referred multiple times to Jamar's "lies" when he used Lamar's name to get medical treatment. Jamar admitted that he lied to police and the hospital about his name. In closing argument, defense counsel told the jury that witnesses credibility was an important consideration and that they would have "to judge them based upon how they presented their testimony to you and what they say." Defense counsel continued, arguing that

"we're searching for a formula of truth. And the State has presented and has chosen to rely on admitted liars. We can't say that the equation starts with the truth cause [*sic*] on the day that Jamar Slatton was shot, one of the first things he told simple as it is a lie about his name.

He said, I'm Lamar Slatton to the nurses, the triage, and the police. \*\*\*
And that first conversation with Detective Miller, that sets the whole stage. Because not only did he lie I'm Lamar Slatton, he mentioned people, but he didn't say three hours after leaving the hospital Demonte Clark shot me.

\*\*\*

They want you to believe that twin brothers that corroborate their own lies would not ever even talk about the most traumatic event that you can experience and that's having your life having attempted to be taken away."

¶ 58    When referring to Jamar and his testimony, defense counsel used the words lie, liar, or lying 22 times throughout closing argument, effectively highlighting the issue of Jamar's credibility. Defense counsel also remarked, "[i]f they can't identify Charles Foster from [defense counsel], how can you identify Demonte Clark among a group of five people riding away with one of them shooting at them."

¶ 59    In rebuttal, the prosecutor responded,

"PROSECUTOR: From the very beginning, it was a lie. Somebody went there and talked to them. You heard from Jamar Slatton and you heard from his father this morning that that person is that person. Counsel jumps up and says, well, you know what if we they [*sic*] misidentify the investigator, then Jamar must have misidentified it. That's why you

heard from the father this morning because we knew that would be the argument. The father was there. He has no reason to lie. Jamar has no reason to lie about who the investigator was. Who cares.

It is absolutely proper and you're going to get a jury instruction that says it is proper for an attorney or investigator to go interview a witness. There is absolutely no problem with that. The problem is that they were deceived. They were lied to. So can you believe what came out of his mouth Charles Foster's mouth from that witness stand. This recant. And why is that a problem say now that he's on a bike and he wasn't shooting towards them. That's what Mr. Foster claims that he said. It didn't happen. Why? Why? Because they're trying to manipulate the testimony.

They're trying to make Jamar look like a liar, and why do that? Because he's guilty. Those are the lengths that they go to make sure that he is found not guilty. And it's not acceptable. If you believe for a second that Charles Foster was, in fact, there, he at very least which he wasn't it was Counsel—

DEFENSE ATTORNEY: Objection.

THE COURT: Ladies and gentlemen of the jury, you've heard the evidence in the case. You're to consider the evidence that you've heard and proceed on.

PROSECUTOR: The witness Jamar Slatton and his father said it was the attorney that was there. But if you believe for a moment that the real person that was there was Charles Foster, you can't believe a word that he said. He didn't know anything about the time, place of the interview. He said he wrote notes but he trashed them. He said he took mental notes but didn't write the report until about a week later. ***"

¶ 60    Defendant argues that the prosecutor's comments in rebuttal constituted reversible error where she accused the defense of manipulating testimony and stated that the defense would go to great lengths to acquit defendant, including intentionally suborning perjury by Charles Foster. He contends he was prejudiced by these comments, citing *People v. Thompson*, 313 Ill. App. 3d 510, 514-15 (2000). In *Thompson*, the "clear implication" of the prosecutor's comments was the defendant and his counsel had a "nefarious plan to obtain witness recantations and to 'fix' defendant's case." *Id.* at 514. This court found "that the prejudice from the comments in this case was of such a magnitude that the jury was poisoned." *Id.* at 515.

¶ 61    *Thompson* is distinguishable. Here, the prosecutor made the remarks in response to defense counsel's closing argument referring to Jamar as a liar or lying, not once but 22 times. As support for his argument, counsel referred to Jamar's testimony that it was not Foster but defense counsel who came to interview him. The prosecutor may respond to comments that clearly invite a response. *People v. Nieves*, 193 Ill. 2d 513, 534 (2000). Prosecutor comments that were invited by defense counsel's argument cannot be relied upon as error on appeal. *Id.*

¶ 62    Defendant next alleges that he was denied a fair trial when the court allowed Detective Muhney to testify that, although he found a photo of defendant and others in the computer database, he did not have one of Ross because "[h]e had not been arrested as of yet." Defendant argues that this testimony improperly informed the jury that defendant had prior criminal arrests. "Mug shot" evidence that tends to inform the jury of defendant's prior criminal acts is not admissible. *People v. Nelson*, 193 Ill. 2d 216, 224 (2000). However, when erroneously admitted, such evidence "will not warrant a reversal when competent evidence establishes the defendant's guilt beyond a

reasonable doubt, and it can be concluded that retrial without the challenged evidence would produce no different result." *Id.*

¶ 63     The evidence at trial was not closely balanced. All three eyewitnesses to the shooting testified consistently about the incident. Jamar, Lamar, and Daja separately and positively identified defendant as the shooter in a photo array, in a physical lineup, and in interviews with the police. New streetlights had just been installed, and Jamar testified that he could see the shooter clearly because "[t]he light was right up under him" and nothing obstructed his view. All three knew defendant because they had gone to school with him in the past. Jamar and Lamar had also played basketball with defendant. The positive and credible testimony of a single witness is sufficient to convict, even if it is contradicted by the defendant. *People v. Gray*, 2017 IL 120958, ¶ 36. Given the strong identification testimony of three eyewitnesses, retrial without Detective Muhney's statement about Ross would not produce a different result.

¶ 64     Furthermore, defense counsel objected to the statement, and the court sustained the objection while instructing the jury to disregard the answer. The State did not refer to Detective Muhney's statement again during the trial. Where overwhelming evidence of defendant's guilt is presented and the trial court sustains an objection to the improper evidence and instructs the jury to disregard it, defendant was not prejudiced by the error. *People v. Arman*, 131 Ill. 2d 115, 124 (1989).

¶ 65     For these reasons, we find that the admission of Jamar's and Coats's testimony regarding the identification of the investigator, the prosecutor's comments in rebuttal, and Detective Muhney's statement about Ross did not constitute reversible error.

¶ 66    Since we find that defendant received a fair trial and thus affirm his convictions, we address his argument that the 2016 amendment to section 5-130 of the Act retroactively applied to his case. Defendant was 15 years old when the crimes occurred. At that time, section 5-130(1)(a) provided that the juvenile court's exclusive jurisdiction did not "apply to any minor who at the time of an offense was at least 15 years of age" and who committed one of the enumerated offenses including "aggravated battery with a firearm *** where the minor personally discharged a firearm." 705 ILCS 405/5-130(1)(a) (West 2012). Thus, defendant's case proceeded in the trial court.

¶ 67    On January 1, 2016, after defendant's jury conviction but before his sentencing, the amendment to section 5-130 became effective. Among other changes, the amendment raised the age of excluded jurisdiction from 15 to 16 years old. See Pub. Act 99-258 (eff. Jan. 1, 2016). Defendant argues that, because his case was still pending in the trial court when the 2016 amendment took effect, the amended provision should have been applied retroactively to his case. He contends the trial court erred when it denied his motion to remand the cause to juvenile court for sentencing. Whether statutory amendments apply retroactively to defendant's case is an issue we review *de novo*. *People v. Hunter*, 2017 IL 121306, ¶ 15.

¶ 68    In *Howard*, our supreme court held that the 2016 amendment applied retroactively to cases pending trial. *Howard*, 2016 IL 120729, ¶ 28. The court noted that " '[w]hether a defendant is tried in juvenile or criminal court is purely a matter of procedure.' " *Id.* (quoting *People v. Patterson*, 2014 IL 115102, ¶ 104). Pursuant to section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2014)), which provides that procedural law changes will apply to ongoing proceedings, the legislature "clearly indicated that this statutory amendment should apply retroactively." *Howard*, 2016 IL 120729, ¶ 28. The court also found no constitutional impediment to the retroactive application of

the 2016 amendment. *Id.* The court disagreed with the State that transferring a case that had been pending in criminal court for three years was disruptive and impracticable. *Id.* ¶¶ 32-33. Instead, the court found that "practicable" in this context means " 'reasonably capable of being accomplished; feasible.' " *Id.* ¶ 32 (quoting Black's Law Dictionary 1291 (9th ed. 2009)). It was clear to our supreme court that "transferring this case to juvenile court for a transfer hearing is something that is feasible." *Id.*

¶ 69 In *Hunter*, however, our supreme court declined to extend its holding to cases pending on appeal. Unlike *Howard*, where the proceedings that had begun under the old statute "had not yet been concluded" and thus were " 'ongoing,' " the defendant in *Hunter* had been tried and sentenced. *Hunter*, 2017 IL 121306, ¶¶ 30, 32 (quoting *Howard*, 2016 IL 120729, ¶ 28).Thus "the proceedings in the trial court were completed well before the statute was amended." *Id.* ¶ 32. The defendant in *Hunter* also raised no claim of reversible error necessitating remand for further proceedings before the trial court. *Id.* Our supreme court found, therefore, that "[n]othing remains to be done." *Id.*

¶ 70 Here, defendant's case does not precisely align with *Howard* or *Hunter* because, although he had already been convicted when the amendment became effective, he had not yet been sentenced. This exact issue was addressed in *People v. Price*, 2018 IL App (1st) 161202. In *Price*, the court reasoned that, in criminal cases, the final judgment is not the guilty verdict; rather, " 'the final judgment is the sentence.' " *Id.* ¶ 20 (quoting *People v. Vara*, 2018 IL 121823, ¶ 14). Thus, where a defendant had been convicted but not sentenced, trial court proceedings were ongoing and something " 'remain[ed] to be done.' " *Id.* ¶ 22 (quoting *Hunter*, 2017 IL 121306, ¶ 32).

¶ 71　Furthermore, a case that had been tried in the circuit court could feasibly be transferred to juvenile court for sentencing. The court in *Price* noted that, when an amended version of a rule is applied retroactively, only proceedings taking place after the enactment of the new rule must conform to it, as far as practicable. *Id.* ¶ 19 (citing *People v. Easton*, 2018 IL 122187, ¶ 21). The court found that, "[j]ust as the indictment and trial could be separated in *Howard*, here the finding of guilt and the sentencing were separate proceedings." *Id.* ¶ 21. Section 5-130(1)(c)(ii) of the Act acknowledges this distinction between conviction and sentencing, as it provides that a defendant who is tried as an adult may be sentenced in juvenile court. *Id.* Therefore, the 2016 amendment should have applied to the defendant's case where he had not been sentenced when the amendment took effect. *Id.* ¶ 22.

¶ 72　The defendant in *Price*, however, was not yet 21 years old when the court reversed his sentence. The State, citing *Hunter* and *People v. Foxx*, 2018 IL App (1st) 162345, argues that retroactive application is not feasible where defendant is now over the age of 21 and no longer under the authority of the Act. See 705 ILCS 405/5-105(10) (West 2016) (" 'Minor' means a person under the age of 21 years subject to this Act."). These cases, however, are distinguishable.

¶ 73　The defendant in *Hunter* had been convicted and sentenced before the 2016 amendment became effective. He did not request a new sentencing hearing under the Act but instead sought remand for a discretionary transfer hearing. *Hunter*, 2017 IL 121306, ¶ 41. Our supreme court found that such a hearing, which proceeds in juvenile court, was not feasible given that the 22-year-old defendant was "no longer subject to the jurisdiction of the juvenile court." *Id.*

¶ 74　In *Foxx*, the defendant was convicted of murder and aggravated battery with a firearm, crimes he committed when he was 15 years old. *Foxx*, 2018 IL App (1st) 162345, ¶ 1. He was

convicted and sentenced long before the 2016 amendment became effective. In 2008, he filed a postconviction petition, and after a hearing, the defendant's original sentence was vacated pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), and *People v. Davis*, 2014 IL 115595. *Foxx*, 2018 IL App (1st) 162345, ¶ 8. The matter was set for a new sentencing hearing. The 2016 amendment became effective approximately 6 months before his new sentencing hearing, which took place when the defendant was 34 years old.

¶ 75    On appeal after his resentencing, the defendant claimed that his counsel was ineffective for failing to request a discretionary transfer hearing in juvenile court before the defendant was resentenced as an adult. *Id.* ¶ 36. The court found that, even if counsel was ineffective, the defendant was not prejudiced because, had a motion for a discretionary transfer hearing been filed, remand to juvenile court was not feasible where, "as an adult, the defendant would not be subject to juvenile proceedings under the Act." *Id.* ¶¶ 37, 43.

¶ 76    Unlike the adult defendants in *Hunter* and *Foxx*, defendant here does not seek a discretionary transfer hearing in juvenile court on appeal. Instead, he argues that the cause should be remanded to the trial court to determine whether he should be sentenced as an adult, if the State files the required petition. See 705 ILCS 405/5-130(1)(c)(ii) (West 2016). This procedure is certainly feasible, unlike the situation in *Hunter* or *Foxx*. Therefore, following *Price*, we find that the 2016 amendment retroactively applies to defendant's case.

¶ 77    There remains the question of an appropriate remedy, where defendant is over 21 years old and is no longer under the authority of the Act. On this issue, we find *People v. Fort*, 2017 IL 118966, instructive.

¶ 78    The defendant in *Fort*, who was 16 years old when he committed the offense, was charged with first degree murder and tried as an adult pursuant to the excluded jurisdiction provision of the Act. *Id.* ¶ 1. Under the version then in effect, "any minor who at the time of an offense was at least 15 years of age and who is charged with: (i) first degree murder" "shall be prosecuted under the criminal laws of this State." 705 ILCS 405/5-130(1)(a) (West 2008).The statute further provided that, if "the minor is convicted of any offense covered by paragraph (a) of this subsection (1)," the trial court may sentence the minor as an adult under the Unified Code of Corrections. *Id.* § 5-130(1)(c)(i).

¶ 79    Although the trial proceeded on the charge of first degree murder, the defendant was ultimately convicted of the uncharged offense of second degree murder, an offense not listed in the excluded jurisdiction provision. *Fort*, 2017 IL 118966, ¶¶ 12-13. Without objection by the defendant and without the State filing a written motion to request a hearing on the matter, the trial court sentenced defendant as an adult pursuant to subsection (c)(i). *Id.* ¶ 13. Our supreme court reviewed the issue as plain error, noting that " '[t]he imposition of an unauthorized sentence affects substantial rights.' " *Id.* ¶ 19 (quoting *People v. Hicks*, 181 Ill. 2d 541, 545 (1998)).

¶ 80    The defendant argued that, since he was convicted of second degree murder instead of first degree murder, he should have been sentenced as a juvenile under section 5-130(1)(c)(ii). Section 5-130(1)(c)(ii) provided that if the minor is convicted of an offense "not covered by paragraph (a) of this subsection (1), *** unless the State requests a hearing for the purpose of sentencing the minor under Chapter V of the Unified Code of Corrections, the Court must proceed under Sections 5-705 and 5-710 of this Article." 705 ILCS 405/5-130(1)(c)(ii) (West 2008). Sections 5-705 and 5-710 refer to proceedings in juvenile court. See *id.* §§ 5-705, 5-710. Our supreme court agreed

with the defendant that his adult sentence was imposed in violation of the Act. *Fort*, 2017 IL 118966, ¶ 24. It found that "[u]nder the plain language of the statute" the defendant should have been sentenced under subsection (1)(c)(ii) and, "[i]n the absence of a request by the State for adult sentencing, defendant's adult sentence is contrary to the express statutory language and must be vacated." *Id.* ¶ 31.

¶ 81    As for the appropriate remedy, the court recognized that the subject of juvenile sentencing never arose before the trial court and, thus, the State had no reason to request a hearing under section 5-130(1)(c)(ii) for the purpose of sentencing the defendant as an adult. *Id.*¶ 41. It found that

> "the proper resolution is to remand the cause to the trial court with directions to vacate
> defendant's sentence and allow the State to file a petition requesting a hearing for adult
> sentencing pursuant to section 5-130(1)(c)(ii). Should the trial court find after the hearing
> that defendant is not subject to adult sentencing, the proper remedy is to discharge the
> proceedings against defendant since he is now over 21 years of age and is no longer eligible
> to be committed as a juvenile under the Act. See 705 ILCS 405/5-755(1) (West 2008) (a
> defendant's commitment under the Act terminates automatically upon his or her twenty-
> first birthday); *In re Jaime P.*, 223 Ill. 2d 526, 539-40 (2006)." *Id.*

¶ 82    The parties agree that, if we find defendant was sentenced in error and vacate his sentence and remand the cause for resentencing, the State should have the opportunity to file a petition to request a hearing pursuant to section 5-130(1)(c)(ii) of the Act. The procedure outlined in the subsection (1)(c)(ii) applies when "the court finds that the minor committed an offense not covered by" section 5-130(1)(a). 705 ILCS 405/5-130(1)(c)(ii) (West 2016). It is silent when it comes to a

defendant who, like defendant here, committed an enumerated offense but no longer meets the provision's age requirement. Both requirements, however, appear in the same section of the Act. As such, our supreme court's determination in *Fort* informs our analysis. See *Hunter*, 2017 IL 121306, ¶ 18. The court in *Price* also utilized *Fort*'s remedy, even though it recognized that the provision did not expressly contemplate the defendant's situation. *Price*, 2018 IL App (1st) 161202, ¶ 28. We agree with *Price* that subsection (1)(c)(ii) "reflects the legislature's understanding of what will happen when a defendant who was properly charged and tried as an adult no longer meets the requirements for automatic transfer" at the time of his or her sentencing. *Id.*

¶ 83    Defendant was sentenced pursuant to section 5-130(1), but at the time, he did not meet the threshold requirement that "at the time of an offense [he] was at least 16 years of age." 705 ILCS 405/5-130(1)(a) (West 2016). We find that his sentence, like the defendant's sentence in *Fort*, was in violation of the Act and must be vacated.

¶ 84    As in *Fort*, after remand to the trial court the State will have an opportunity to file a petition to request a hearing for adult sentencing pursuant to section 5-130(1)(c)(ii). Defendant, however, is now over 21 years old. "Should the trial court find after the hearing that defendant is not subject to adult sentencing, the proper remedy is to discharge the proceedings against defendant since he is now over 21 years of age and is no longer eligible to be committed as a juvenile under the Act." *Fort*, 2017 IL 118966, ¶ 41. *Fort*'s remedy applies here as well.

¶ 85                                    IV. CONCLUSION

¶ 86    For the foregoing reasons, defendant's convictions are affirmed. However, we remand the cause to the trial court with directions to vacate defendant's sentence and give the State 10 days

from the date the sentence is vacated to file a petition requesting a hearing pursuant to section 5-130(1)(c)(ii) of the Act. 705 ILCS 405/5-130(1)(c)(ii) (West 2016). If after a hearing the trial court determines that defendant is not subject to adult sentencing, the proceedings against defendant should be discharged, as he is no longer eligible for commitment as a juvenile under the Act.

¶ 87      Affirmed in part and reversed in part.

¶ 88      Cause remanded with directions.

No. 1-18-2533

| | |
|---|---|
| **Cite as:** | *People v. Clark*, 2020 IL App (1st) 182533 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-11698; the Hon. Lawrence E. Flood, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Miriam Sierig, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, Christine Cook, and Nancy Nazarian, Assistant State's Attorneys, of counsel), for the People. |