Docket No. 108319.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RENE
AMIGON, Appellant.

*Opinion filed November 18, 2010.*

CHIEF JUSTICE KILBRIDE delivered the judgment of the court,
with opinion.

Justices Freeman, Thomas, Garman, Karmeier, Burke, and Theis
concurred in the judgment and opinion.

## OPINION

Defendant challenges the sufficiency of the State's causation
evidence and the admission of his 1995 custodial statement. While
serving consecutive prison terms for first degree murder (720 ILCS
5/9–1(a)(1) (West 1992)) and two counts of aggravated battery with
a firearm (720 ILCS 5/12–4.2(a)(1) (West 1992)) stemming from a
1994 shooting incident, defendant was charged with a second murder
after another of the original shooting victims died from pneumonia
five years later. During trial in the circuit court of Cook County,
defendant's 1995 custodial statement was admitted, as was causation
testimony from a Cook County assistant medical examiner. Defendant
was convicted of the murder and sentenced to mandatory life in
prison. The appellate court affirmed (388 Ill. App. 3d 26), and we

affirm the appellate court judgment.

## I. BACKGROUND

In 1998, defendant and a codefendant were convicted in the Cook County circuit court of first degree murder and two counts of aggravated battery with a firearm for a 1995 gang-related shooting that occurred when defendant was 18 years old. He was sentenced to consecutive prison terms of 50, 30, and 20 years, respectively. During the investigation of the incident in 1995, defendant made a custodial statement.

One of defendant's 1998 aggravated battery convictions was for the shooting of Alfonso Ruiz. Ruiz was shot in the neck, causing a spinal cord injury and paralyzing him from the neck down, leaving him capable of moving only his head and biceps. After his initial hospitalization and treatment, Ruiz was able to live with family members, obtain his GED, and begin college classes. He later returned to physical therapy with the goal of obtaining a driver's license to increase his independence by enabling him to drive a specially equipped vehicle.

Approximately 5½ years after he was shot, Ruiz was hospitalized with community acquired bacterial pneumonia and died at the age of 22. After a number of Ruiz's organs were removed for transplantation, Dr. Nancy Jones, the Cook County assistant medical examiner, conducted an autopsy. She concluded that the cause of Ruiz's death was "pneumonia due to quadriplegia due to a gunshot wound to the neck."

In January 2002, defendant was indicted for Ruiz's murder (720 ILCS 5/9–1(a)(1), (a)(2) (West 1992)). He filed a motion requesting the court to take notice that he was already serving a 30-year prison sentence for the aggravated discharge of a firearm for Ruiz's 1995 shooting. Defendant also filed a motion *in limine* to bar the use of his 1995 custodial statement to the police because it was not electronically recorded, a violation of section 103–2.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103–2.1 (West 2006)). That motion was denied.

At defendant's 2006 trial for Ruiz's murder, the State presented evidence that included: (1) defendant's 1995 custodial statement; (2)

-2-

testimony about the extent of Ruiz's injuries and activities after the shooting; (3) a transcript of Ruiz's testimony at defendant's first trial about the day of the shooting and the injuries Ruiz received; and (4) the testimony of Dr. Jones, the assistant medical examiner who had reviewed a report of Ruiz's background and medical records and conducted the autopsy.

At trial, Dr. Jones explained that ordinarily only relatively healthy organs are harvested for transplantation and that Ruiz's spleen, part of his small intestine, heart, kidneys, pancreas, adrenal gland, and many of his lymph nodes had been removed before she conducted the autopsy. Although she could have obtained descriptions of the removed organs and even had the organs returned for examination, she did not find those actions necessary. The autopsy revealed acute bacterial pneumonia in Ruiz's lungs, and Dr. Jones identified it as community acquired pneumonia because his infection did not originate in a hospital. Dr. Jones stated she was unable to test for the specific bacteria involved because of contamination from the prior organ removal and the two-day delay in her receipt of the body.

Dr. Jones concluded, however, that Ruiz's paralyzing gunshot injury was related to his development of pneumonia and subsequent death because the gunshot severely damaged his fourth cervical vertebra, affecting his lung function.

Dr. Jones also stated that, as a quadriplegic, Ruiz showed typical signs of medical wasting, causing him to become thinner and compromising his immune system due to his inability to move around. She was unable to analyze his immune system, however, because his spleen and most of his lymph nodes had been removed. Dr. Jones testified that Ruiz was "more susceptible" to pneumonia than a "normal" 22-year-old because of his compromised immune system and his inability to breathe regularly and deeply.

On cross-examination, Dr. Jones admitted that anyone can get pneumonia. She added, however, that usually the disease is more severe and lengthy when an individual's immune system is compromised, as occurs more commonly in older people and children. Despite the five years between Ruiz's initial injury and his death, Dr. Jones concluded, within a reasonable degree of medical and scientific certainty, that Ruiz's death was a homicide because a gunshot wound caused the quadriplegia that made him more susceptible to pneumonia.

-3-

The defense presented no witnesses or evidence.

An hour after beginning deliberations, the jury requested a transcript of Dr. Jones' testimony and, after consulting with counsel, the trial court informed the jury that a transcript was not available and instructed it to continue deliberations. The jury found defendant guilty of first degree murder. The trial court denied his posttrial motion seeking either a judgment of acquittal or a new trial based on the insufficiency of the State's causation evidence and an alleged violation of section 103–2.1(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103–2.1(b) (West 2006)), requiring electronic recording of an accused's custodial statement. Defendant was sentenced to mandatory life in prison with no possibility of parole because of his 1995 first degree murder conviction (730 ILCS 5/5–8–1(a)(1)(c)(i) (West 2006)). The appellate court affirmed the conviction. This court allowed defendant's petition for leave to appeal. 210 Ill. 2d R. 315.

## II. ANALYSIS

Before this court, defendant raises two issues: (1) the sufficiency of the State's proximate cause showing; and (2) the retroactive effect, if any, of section 103–2.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103–2.1 (West 2006)), requiring electronic recording of an accused's custodial statement if the statement is to be used as adverse evidence in any criminal proceeding.

### A. Proximate Cause

Defendant argues that the State failed to prove beyond a reasonable doubt that the gunshot he fired in 1995, resulting in Ruiz's quadriplegia, was the proximate cause of Ruiz's death from pneumonia five years later. In examining this issue, we must consider whether, viewing the evidence in the light most favorable to the State, *any* reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Thus, we must affirm defendant's conviction unless no reasonable jury could have found that the State had proven the element of proximate cause beyond a reasonable doubt.

Defendant argues that the State failed to prove proximate cause because it offered only Dr. Jones' unsupported opinion that the

-4-

quadriplegia from the gunshot wound compromised Ruiz's immune system, resulting in his death from pneumonia. He contends that Dr. Jones admitted on cross-examination that able-bodied 22-year-olds also get pneumonia and that she was unable to establish either: (1) actual damage to Ruiz's immune system because his spleen and lymph nodes had been harvested for transplantation before the autopsy was conducted; or (2) the specific type of bacteria underlying Ruiz's pneumonia due to contamination from the organ removal and the delay in her receipt of the body.

Defendant maintains that without a sufficient factual basis for Dr. Jones' opinions, the jury could not give her testimony the proper weight, as reflected by the jury's request for a transcript of her testimony during deliberations. Thus, the jury verdict was unreasonable and speculative, and a new trial is necessary. See *People v. Brackett*, 117 Ill. 2d 170, 177 (1987).

During oral arguments, defense counsel correctly recognized that the issue of proximate cause generally presents a question for the jury but stated that she believed the jury's request for a transcript of Dr. Jones' testimony showed that it was "unclear" on that issue. In addition, counsel candidly acknowledged that the jury could have decided the causation question "either way" but argued that the jury "could have acquitted" defendant.

The mere possibility that a rational jury could have acquitted defendant based on the proximate cause evidence presented is not enough, however, to reverse defendant's conviction under the standard this court must apply when reviewing a challenge to the sufficiency of the State's evidence. A reviewing court may only overturn a jury's finding by concluding that *no* reasonable trier of fact could have found the requisite elements of the offense proven beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261. Here, even defendant does not assert the impossibility that some rational fact finder could have found sufficient proof of causation. Instead, he insists that the jury did not have to find causation based on the State's evidence, an argument we must flatly reject.

Defendant also claims that allowing the verdict to stand will create a "strict liability" standard for murder when the death occurs long after the initial injury and the victim has otherwise recovered to "usual health." His strict liability argument is largely based on his belief that

*People v. Gulliford*, 86 Ill. App. 3d 237 (1980), *People v. Reader*, 26 Ill. 2d 210 (1962), *People v. Carrillo*, 164 Ill. 2d 144 (1995), and *People v. Slywka*, 365 Ill. App. 3d 34 (2006), are distinguishable from this case. In *Gulliford* and *Reader*, the victims foreseeably died within a few weeks of their initial injuries, but defendant argues that Ruiz's death from pneumonia over five years after being shot was not reasonably foreseeable.

The length of time between the victim's initial injuries and later death has not been determinative of whether a defendant is liable for murder based on foreseeability since the 1961 abolition of the common law "one-year-and-a-day" rule. Compare Ill. Rev. Stat. 1953, ch. 38, par. 365, with Ill. Rev. Stat. 1961, ch. 38, par. 9–1 *et seq*. See also *Carrillo*, 164 Ill. 2d at 150 (concluding that the year-and-a-day rule was legislatively abolished in 1961 and has not been part of the criminal law of Illinois since that time). Under that rule, murder charges were barred if the victim died more than a year and a day after the crime. As the appellate court in *People v. Brown*, 57 Ill. App. 3d 528, 531-32 (1978), correctly noted, "[t]he existence of a time interval between the defendant's act and death does not preclude \*\*\* a causal link [citation]; this is true even where, during this interval, there has been an apparent recovery from the injuries inflicted." Thus, we are not persuaded that defendant's murder conviction should be reversed based on the shorter lapses of time between the victims' injuries and their deaths in *Gulliford* and *Reader*.

Defendant also attempts to distinguish his case from *Carrillo* and *Slywka*. In those cases, the lengthy intervals between the victims' initial injuries and their subsequent deaths, nine years in *Carrillo* and eight years in *Slywka*, were not held to be impediments to the filing of murder charges. Defendant asserts that those two cases are distinguishable because those victims never recovered from their initial injuries and "languished" for years before dying (*Carrillo*, 164 Ill. 2d at 146; *Slywka*, 365 Ill. App. 3d at 37), while Ruiz was in a "usual state of health" when he developed pneumonia, according to hospital records. As defendant points out, Ruiz had returned to his community, had obtained his GED, had begun college course work, and was learning to drive a car when he died.

We are not persuaded by defendant's argument, however, because it ignores the reality that Ruiz never fully recovered or returned to

"normal" life after being shot. He remained a quadriplegic after the shooting and, according to Dr. Jones, suffered serious secondary effects to his breathing and immune system as a result of his paralysis. According to Dr. Jones, those adverse consequences, while not curtailing his activities completely or leaving him to "languish" for years, made him more susceptible to pneumonia and less capable of surviving it.

Although defendant criticizes Dr. Jones' testimony for a lack of factual support underlying her opinions on the damage to Ruiz's immune system resulting from his quadriplegia, the record reveals that she testified extensively about the degree of medical wasting she noted during the autopsy. Early in her testimony, she stated that "the most remarkable thing" about her external examination of the body was the "generalized wasting and weight loss with very promenade [*sic*] bone and skeletal region." The autopsy report indicated that Ruiz was five foot seven inches tall but weighed only 107 pounds, although the removal of his organs for transplantation reduced his weight "somewhat."

Dr. Jones also testified that Ruiz's liver exhibited changes that were "not uncommon with individuals who have been losing weight or wasting away over a period of time." In addition, she noted the "atrophy or wasting away [of Ruiz's spinal cord] from damage that had been done to the cord from the bullet passing through the spinal column." She explained that this atrophy allowed a portion of Ruiz's damaged brain stem "on the base of the skull *** to go down the spinal cord." She pointed out the evidence of generalized wasting, spinal cord atrophy, and brain stem movement in photographs shown to the jury.

When asked about the connection between Ruiz's gunshot wound and his pneumonia, Dr. Jones explained that:

> "[an] individual who has paralysis or quadriplegia *** from injuries to their spinal column also begin[s] to undergo medical wasting. They become thinner and their immune systems become compromised because of that muscle wasting, that inability to move and get around adequately. So individuals with damage to the spinal cords are *** compromised because their immune system isn't as strong as it would normally be in an individual who didn't have those

problems."

Based on the autopsy and her review of Ruiz's records, Dr. Jones determined that he "died as result of pneumonia due to quadriplegia due to a gunshot wound to the neck." She testified that, within a reasonable degree of medical and scientific certainty, Ruiz's death was a homicide despite the time that had elapsed since his initial gunshot injury.

Moreover, Dr. Jones' testimony established that her conclusions did not rely solely on her medical opinion that Ruiz's immune system was damaged from his quadriplegia and resultant medical wasting. She testified that Ruiz developed and succumbed to pneumonia because his paralyzing gunshot injury severely damaged his fourth cervical vertebra. She explained that the nerves joining the spinal cord between the fourth and fifth cervical vertebras affect the ability to breathe by using the diaphragm. The gunshot injury to Ruiz's fourth cervical vertebra area damaged those nerves, reducing his "ability to expand his lungs regularly or completely and fully for normal pulmonary toilet."

Dr. Jones also explained the effects of pneumonia on the body. She stated that pneumonia "reduces the person's ability to exchange air," taking in oxygen and expelling carbon dioxide and other waste gases. "If the lung is compromised in any way, say with pneumonia, the normal gas exchange cannot go on. So the oxygen level becomes reduced, and so the organs of the body do not get as much oxygen as they need to survive."

She then connected Ruiz's impaired lung function to his death from pneumonia, stating that:

> "we need an intact nervous system in order to breathe adequately and to prevent ourselves from developing pneumonia or infections. We need to be able to take deep breaths, filling our lungs. And we need to be able to expel that air completely because any time we can't completely empty out the lungs, it allows for secretions, mucosa, saliva, to accumulte [*sic*] in the lungs, typically in the lower lungs, and it becomes a growth media for bacteria. So anything that can compromise your ability to breathe is going to increase our risk for developing pneumonia."

Dr. Jones concluded that Ruiz was "more susceptible" to pneumonia than a "normal" 22-year-old due to his compromised immune system and his inability to breathe regularly and deeply. She noted that while a "normally healthy 22 years old [*sic*] usually survive[s]" pneumonia, because Ruiz's immune system and lung function were compromised as a result of his quadriplegia from the gunshot wound, "he ended up dying from this community acquired bacteria."

Dr. Jones completed her direct examination by summarizing that:

"[g]eneralized muscles [*sic*] atrophy, loss of body mass *** would affect [Ruiz's] ability to maintain a normal immune response.

So Mr. Ruiz acquired a bacterial pneumonia in the community which because he was a quadriplegic, had atrophy and muscle wasting and his respiratory capabilities were compromised because the gunshot wound made him more susceptible than a normal 22 year old would be."

Defendant argues that Dr. Jones' causation testimony suffers from the same lack of factual support as the expert testimony this court rejected in *People v. Brackett*, 117 Ill. 2d 170, 177 (1987). We disagree.

In *Brackett*, the doctor failed to perform an autopsy to determine the source of the embolism that killed the apparently recovering victim, and at trial he merely "surmised" that the source of the embolism was the knife wound inflicted by the defendant. In contrast, here Dr. Jones performed an autopsy, and her testimony was far more specific and clear about the connection between the gunshot injury and Ruiz's ultimate death from pneumonia.

Although the jury did not have to find proximate cause beyond a reasonable doubt based on Dr. Jones' testimony, as defense counsel acknowledged during oral argument, its conclusion that causation existed beyond a reasonable doubt was supported by sufficient evidence. When the evidence is viewed in the light most favorable to the State, a reasonable jury could have come to the same conclusion after considering Dr. Jones' testimony, particularly where she provided the only medical testimony admitted at trial.

Finally, defendant asserts that the appellate court's reasoning

would have allowed defendant to be indicted for murder regardless of when or how Ruiz died simply because he was a quadriplegic. He adds that the legislature's purposes of providing for proportionate penalties while recognizing defendants' rehabilitative potentials are adequately satisfied by the sentences totaling 100 years he was already serving for offenses related to Ruiz's shooting. These prior sentences effectively sentence him to life in prison. See 720 ILCS 5/1–2(c) (West 2006). Defendant argues that adding another natural life sentence for Ruiz's murder would be arbitrary and oppressive, particularly when Ruiz went on to perform many of the same activities as an able-bodied 22-year-old and Dr. Jones could not specify the type of bacteria underlying his pneumonia.

We initially note that the sufficiency of Dr. Jones' testimony to meet the State's burden of establishing causation appears unrelated to defendant's sentencing argument. Even if defendant's sentencing argument is considered, he fails to cite any case law or other authority for his position, and we have found none. He also does not raise a constitutional challenge to the mandatory life statute or its application in his case.

The legislature has chosen to make a natural life sentence mandatory if the defendant has previously been convicted of first degree murder. 730 ILCS 5/5–8–1(a)(1)(c)(i) (West 2006). We conclude that defendant's claim runs counter to the clear legislative intent to provide for lifetime imprisonment for offenders deemed too dangerous to be released into society. The class of individuals for whom the legislature has chosen to mandate mandatory life sentences includes those, such as defendant, convicted of more than one first degree murder. We will not override the clear and express will of the legislature in enacting the mandatory life-sentencing statute based on defendant's bare assertion that the addition of a natural life sentence for his latest murder conviction would be arbitrary and oppressive under the circumstances in this case. Defendant's unrelated sentencing argument does not alter our conclusion that the State presented sufficient causation evidence for a reasonable jury to find defendant guilty beyond a reasonable doubt.

## B. Electronic Recording Statute

The second issue raised on appeal is whether the appellate court erred by failing to apply section 103–2.1(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103–2.1(b) (West 2006)) retroactively. This issue of statutory interpretation presents a question of law to be decided *de novo* on appeal. *People v. Brown*, 225 Ill. 2d 188, 198 (2007). The primary goal in construing a statute is to determine and effectuate the intent of the legislature. The most reliable means of accomplishing that goal is to apply the plain and ordinary meaning of the statutory language. We may not depart from the statute's plain language by reading in exceptions, limitations, or conditions that conflict with the legislature's intent. *In re Detention of Hardin*, 238 Ill. 2d 33, 40 (2010).

Section 103–2.1(b) states:

> "An oral, written, or sign language statement of an accused made as a result of a custodial interrogation at a police station or other place of detention shall be presumed to be inadmissible as evidence against the accused in any criminal proceeding *** unless:
>
> > (1) an electronic recording is made of the custodial interrogation; and
> >
> > (2) the recording is substantially accurate and not intentionally altered." 725 ILCS 5/103–2.1(b) (West 2006).

Although this provision was enacted in 2003, the legislature expressly delayed its effective date until July 2005.

Defendant's brief relies solely on the argument presented in his petition for leave to appeal. In that petition, he contends the trial court erred in denying his motion *in limine* to exclude his 1995 non-video-recorded custodial statement because it violated section 103–2.1(b).

At oral argument, however, defense counsel candidly conceded to the court that defendant's statement was made before the statute's effective date. In addition, she agreed that the legislature's decision to delay implementation of the recording requirement for two years established that it intended the recording requirement *not* to be applied retroactively to exclude custodial statements made years before the statute's enactment date.

Moreover, defense counsel noted at oral argument that she was unable to find any case law to support the argument that the legislature intended the statute to apply retroactively. Notably, neither of the two appellate decisions cited by the State, *People v. Buck*, 361 Ill. App. 3d 923 (2005), and *People v. Armstrong*, 395 Ill. App. 3d 606 (2009), support the retroactive application of the section.

In *Buck*, the trial court refused defendant's modified jury instructions based on section 103–2.1(b). The appellate court affirmed, noting that the statute underlying the modifications was not in effect when the defendant made his custodial statement and that the modified jury instructions had not yet been adopted. *Buck*, 361 Ill. App. 3d at 941-42. In *Armstrong*, only one of the defendant's three statements had been electronically recorded, but the appellate court held that all three statements were properly admitted because the victim was still being treated at the hospital and had not yet died when the statements were made, making the statute inapplicable. Neither of these cases can be construed to support defendant's argument that the electronic recording requirement should be imposed retroactively here.

We conclude that the legislature's express decision to delay the enforcement of the electronic recording requirement until 2005, nearly 10 years after the custodial statement at issue in this case, establishes its intent that the statute not be applied retroactively, as the defense conceded. In addition, defendant has failed to cite any case law for the retroactivity argument presented in his petition for leave to appeal. Accordingly, we decline to override the will of the legislature and reverse the trial court's denial of defendant's motion *in limine* to exclude his 1995 custodial statement because it violated section 103–2.1(b).

### III. CONCLUSION

For the stated reasons, we conclude that defendant has failed to meet his burden of showing that no reasonable jury could have found that the State proved the element of causation beyond a reasonable doubt. We also conclude that the electronic recording requirement of section 103–2.1(b) (725 ILCS 5/103–2.1(b) (West 2006)) does not apply retroactively in this case to bar the admission of his 1995

custodial statement to the police. His statement was properly admitted at trial. Accordingly, we affirm the appellate court judgment.

*Appellate court judgment affirmed.*