2021 IL App (1st) 171801-U

THIRD DIVISION
March 31, 2021

1-17-1801

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 19979 |
| | ) | |
| DEVONTE JEMISON, | ) | Honorable |
| | ) | Angela M. Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

ORDER

¶ 1     *Held:* The evidence was sufficient evidence to sustain defendant's conviction for first degree murder and the finding that he personally discharged a firearm that caused the death of another individual. The trial court did not abuse its discretion by declining to instruct the jury on involuntary manslaughter. However, we vacate defendant's sentence and remand the cause to the trial court so the State may file a petition requesting adult sentencing under the criminal laws.

¶ 2     Defendant, Devonte Jemison, was 15 years old at the time of the offense and charged with first degree murder and personally discharging a firearm that proximately caused the death of another individual. His trial took place in adult court pursuant to the "automatic transfer" provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2006)). Following a

jury trial, Jemison was found guilty of the charges against him and sentenced to 38 years' imprisonment.

¶ 3     Jemison's conviction stems from the July 4, 2007 shooting of Brandon Rozelle, who was paralyzed because of his injuries and died approximately a month later from pneumonia. In this appeal, Jemison argues his conviction should be reversed and the cause remanded for a new trial because: (a) the evidence was insufficient to sustain his murder conviction where the State failed to prove beyond a reasonable doubt that the pneumonia resulting in the victim's death was caused by the gunshot; and (b) the trial court committed reversible error by denying his request for an involuntary manslaughter instruction. Alternatively, Jemison argues his sentence should be vacated and the cause remanded for new sentencing procedures under section 5-130 of the Juvenile Court Act because: (i) the trial court incorrectly determined that the 2016 amendment to the Act's automatic transfer provision, which raised the age of automatic transfer from 15 to 16, was not applicable to him; (ii) his sentence was excessive in light of his circumstances; (iii) at sentencing, the trial court improperly considered in aggravation, a factor inherent in the offense; and (iv) trial counsel was ineffective for failing to present available mitigating evidence.

¶ 4     For the following reasons, we affirm Jemison's conviction, vacate his sentence, and remand the cause to the trial court with directions to allow the State to file a petition for adult sentencing.

¶ 5                                          BACKGROUND

¶ 6     Following a verbal altercation on July 4, 2007, Jemison, who was then a juvenile, shot the victim, Brandon Rozelle, paralyzing him from the chest down. Rozelle died a month later, on August 24, 2007, from pneumonia. Jemison was charged with first degree murder and personally discharging a firearm which caused Rozelle's death. Jemison's case was transferred to adult

court pursuant to the Juvenile Court Act's automatic transfer provision then applicable to minors 15 years of age and older, charged with certain enumerated crimes such as first degree murder. Following his first jury trial, Jemison was found guilty of the charges against him and sentenced to 50 years' imprisonment. On direct appeal, this court reversed his conviction and remanded the cause for a new trial, having found he was improperly impeached with his prior adjudication. See *People v. Jemison*, 2011 IL App (1st) 093204-U. Jemison's second trial commenced in 2014, after which a jury found him guilty of the same charges, and he was subsequently sentenced as an adult to 38 years in prison.

¶ 7                                   Jemison's Second Trial

¶ 8          The relevant evidence and details from Jemison's 2014 trial are as follows:

¶ 9          Approximately one month prior to the July 4, 2007 shooting at issue, Jemison was shot in the hip by a person named Casper because Jemison owed him money. The bullet fractured Jemison's hip requiring him to wear a brace and caused him to walk with a limp. Jemison testified Rozelle was present when he was shot, but otherwise Rozelle had nothing to do with him having been shot. On the suggestion of an older person from his neighborhood, Jemison purchased a gun for $100 for protection. The individual who sold Jemison the gun told him there were six bullets in the gun but did not show him how to use the gun. Jemison testified he did not check to see if the magazine had any bullets, though he previously testified he did check the magazine after purchasing the gun.

¶ 10         James Jones testified that on July 2, 2007, he, Jemison, and another friend were at Celina Schaffer's home when Jemison removed a black .380 automatic gun from his waist area, took the clip out of the gun, and then put the clip "away." Jones initially testified he only saw people taking the magazine out and putting it back in, but later testified he saw someone other than

Jemison "steady cocking [the gun] back, making bullets come out." Jemison subsequently put the gun somewhere in another room.

¶ 11 Jemison also testified about showing the gun to his friends on July 2, 2007. He testified that while his gun was out, he pressed a button on the gun and the magazine fell on the floor. He put the magazine back in the gun, then took the magazine out and placed it back in the gun a second time. Jemison testified he allowed a person named Rodney to see the gun but did not pay attention to what Rodney and others were doing with the gun because he was talking to someone else. He eventually took the gun back and put it under the couch. Jemison testified he did not check the gun's chamber, magazine, or safety prior to doing so.

¶ 12 Two days later, on July 4, 2007, Jones testified that at some time between 10:00 a.m. and 1:00 p.m. he, Schaffer, and Rodney were sitting on Schaffer's porch when Rozelle walked by on the same side of the street and asked where Jemison was. They told him Jemison was on a porch across the street with some other individuals. Jones testified Rozelle called out to Jemison to "come here." Jemison responded, "hold on." Rozelle more aggressively, called out for Jemison to "come here." He was again told by Jemison to "hold on." Rozelle responded, "All right, forget it," to which Jemison replied Rozelle should "beat his feet," which Jones explained meant leave. Jemison did not recall telling Rozelle to "beat his feet" though he previously testified to having made this statement. Rozelle began talking back, but Jones could not recall what was said.

¶ 13 Jones testified Jemison walked off the porch, pulled out the gun from July 2 and was holding it at his side pointed at the ground. Jemison crossed the street and walked toward Schaffer's home while Rozelle crossed the street in the opposite direction. Jones went into Schaffer's backyard but could see both Jemison and Rozelle. Jones testified that while Jemison

was standing in front of Schaffer's gangway, Rozelle, who was standing with his arms outstretched, said, "What you gonna shoot me? I ain't afraid to die." Jones did not see anything in Rozelle's hands or waistband. Jones ran away because he was scared. As he was running, Jones heard a "paw" sound. He came back out to the street and saw Rozelle collapse and then Jemison limp through Schaffer's gangway.

¶ 14        Ashley Head testified that on July 4, 2007, she was sitting on her porch three houses down from Schaffer's when she saw Jemison and Rozelle cross the street in opposite directions. Jemison had a black gun in his hand and was arguing with Rozelle. She testified Jemison walked to the front of Schaffer's gangway while Rozelle was on the other side of the street. Jemison then pointed a gun at the unarmed Rozelle and said, "Do you want to keep talking shit?" Jemison then fired the gun at Rozelle who had not moved toward him.

¶ 15        Jemison testified that on July 4, 2007, he was on his friend's porch when he saw Rozelle get out of a car and walk down the block on the opposite side of the street. When Rozelle was directly across the street, Rozelle called out to him, "check it out, like come here."  He responded, "I'm straight," not wanting to be bothered by Rozelle. Rozelle responded, "come here." Jemison replied, "I'm cool." Rozelle then said, "Check it out with your bitch ass." Jemison testified he looked up and saw Rozelle crossing the street towards him. Jemison walked off the steps of the porch and walked across the street toward Schaffer's house ending up on the curb in front of the house while Rozelle was on the sidewalk across the street. Rozelle kept talking but Jemison was not really listening to him and testified he just wanted to get away from Rozelle. While not initially afraid of Rozelle, Jemison testified he became afraid as Rozelle got aggressive.

¶ 16    Jemison testified he pulled his gun out of his pocket and held it down at his side. At some point, Rozelle said something like "I ain't afraid to die" with his arms outstretched chest high. Rozelle's hands were empty. Jemison testified that when Rozelle started walking towards him, he pointed it at Rozelle "quick draw like." When he raised the gun up, his fingertip hit the trigger and the gun fired. Jemison acknowledged hitting the trigger is the same thing as pulling the trigger. He testified he did not recall pulling the trigger. Jemison testified he only wanted to scare Rozelle. He did not intend to fire the gun. He did not know if there was a bullet in the chamber when he raised the gun up and pointed it at Rozelle. He did not know there needed to be a bullet in the gun's chamber to fire the gun. It was his first time ever with a gun and he had never fired a gun before in his life.

¶ 17    Jemison testified he stood in shock after shooting Rozelle and then limped into Schaffer's gangway. He threw the gun in the bushes and hid in a bedroom closet in Schaffer's home because he was scared. He was taken into police custody and his gun was recovered from the bushes.

¶ 18    A firearm expert testified the gun was properly functioning, but the slider was jammed in the rear position. She explained this can occur if the next round in the magazine is not chambered properly, which can happen if the magazine is not seated properly, if the rounds are misaligned in the magazine, or if the shooter holds the gun too loosely so that the recoil is not sufficient. The gun was otherwise functioning properly.

¶ 19    Following the shooting, Rozelle was taken to the hospital and remained in the ICU for approximately one week and then went to a rehabilitation center for two weeks before returning home where he continued outpatient rehabilitation. On August 23, 2007, Rozelle, who was 19

years old, experienced chest pain and was transported back to the hospital where he died the following day of pneumonia.

¶ 20    Dr. Ponni Arunkumar performed the autopsy on Rozelle. She learned from Rozelle's medical records that he died of pneumonia. She testified that to a reasonable degree of medical certainty it was her opinion Rozelle's "cause of death was due to pneumonia, due to the gunshot wound to the abdomen." She reviewed the report of the postmortem examination of Rozelle prepared by another doctor, photographs from the autopsy, and some medical records present in Rozelle's file. She noted wasting in Rozelle's leg muscles due to lack of use from Rozelle's paraplegia caused by the gunshot to his chest fired by defendant.

¶ 21    Dr. Arunkumar also identified various possible entry points for Rozelle's pneumonia infection to include a linear scar due to a chest tube placed to drain the blood from his chest cavity; a linear scar on the abdomen with sutures or staples placed during Rozelle's surgery; a circular scar closer to the linear scar from the bullet; and a second more irregular circular scar she testified was possibly due to a draining tube placed in his abdomen.

¶ 22    She testified Rozelle had fevers in the hospital and his blood cultures initially came back positive indicating bacterial pneumonia. She acknowledged that not everyone who gets shot gets pneumonia but testified that Rozelle "had a number of possibilities of getting the infection in his lung because of the fact that he was paralyzed ***." She testified she could not say where the infection came from or conclude to a reasonable degree of scientific certainty whether the pneumonia was caused by a virus or bacteria, but testified that, "Based on the hospital records showing a positive blood culture, I would go more - it's more probable that it's bacteria, but I cannot rule out the viral cultures because those weren't done in the hospital or at autopsy."

¶ 23    After the close of evidence, Jemison requested the jury be instructed on second degree murder and involuntary manslaughter. The trial court denied his request for an involuntary manslaughter instruction but agreed to give a second degree murder instruction.

¶ 24    On November 14, 2014, the jury found Jemison guilty of first degree murder and that he had personally discharged the firearm proximately causing Rozelle's death.

¶ 25                    Posttrial Proceedings and Sentencing

¶ 26    Defendant filed a motion for a new trial, which was denied on October 1, 2015.

¶ 27    Prior to Jemison being sentenced, the amendments to the Juvenile Court Act's automatic transfer provision became effective, raising the age for minors subject to the transfer provision from 15 to 16 years of age and up. In response, in January of 2016, Jemison filed a motion arguing the amendments should apply retroactively to him because he was 15 years old when he was charged with the underlying offenses. The trial court denied his motion. Thereafter, he was sentenced to 38 years in prison, with a three-year term of mandatory supervised release pursuant to the Unified Code of Corrections.

¶ 28    This timely appeal followed.

¶ 29                            ANALYSIS

¶ 30    On appeal, Jemison argues his conviction should be reversed and the cause remanded for a new trial because: (a) the evidence was insufficient to sustain his murder conviction where the State failed to prove beyond a reasonable doubt that the pneumonia Rozelle died from was caused by the gunshot wound; and (b) the trial court committed reversible error by denying his request that the jury be instructed on involuntary manslaughter. Alternatively, Jemison argues his sentence should be vacated and the cause remanded for new sentencing procedures under section 5-130 of the Juvenile Court Act (Act) (705 ILCS 405/5-130 (West 2018)) because: (i) the trial

court incorrectly determined that the 2016 amendment to the Act's automatic transfer provision did not apply to his case; (ii) his sentence was excessive in light of the circumstances; (iii) the trial court improperly considered a factor inherent in the offense; and (iv) trial counsel was ineffective for failing to present available mitigating evidence.

¶ 31    In reviewing the sufficiency of the evidence, we determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt when viewing the evidence in a light most favorable to the prosecution. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). A trial court's refusal to give a jury instruction is reviewed for an abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 25. Whether a statutory amendment applies retroactively to a defendant's case presents an issue of statutory construction which we review *de novo*. *People v. Hunter*, 2017 IL 121306, ¶ 15.

¶ 32                                Sufficiency of the Evidence

¶ 33    Jemison first argues the evidence was insufficient to sustain his murder conviction. His sufficiency of the evidence argument centers around the causation testimony of the State's forensic pathology medical expert, Dr. Arunkumar, who testified the victim died from pneumonia. The issue raised by Jemison is whether that testimony is sufficient to prove his criminal act—having shot Rozelle which resulted in Rozelle's paraplegia—contributed to Rozelle's death from pneumonia. Based on a careful review of the record and Dr. Arunkumar's testimony, we do not find the causation evidence here is so unreasonable, improbable, and unsatisfactory as to create a reasonable doubt that Jemison's act was a contributing cause to Rozelle's death.

¶ 34    "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant *** [rather] 'the relevant question is whether, after viewing

the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 35    The material facts which constitute the crime of murder are "proof of death and proof of a criminal agency causing death." *People v. Brown*, 57 Ill. App. 3d 528, 531 (2009). As to the latter, the "State's burden is not to prove that the defendant's act is the sole and immediate cause of death, but that the defendant's act was, beyond a reasonable doubt, a contributing cause to a death such that the death did not result from a source unconnected with defendant's act." *Id.*

¶ 36    When criminal acts of the defendant have contributed to the victim's death, the defendant may be found guilty of murder. *People v. Brackett*, 117 Ill. 2d 170, 176 (1987). "[W]here causative factors are less obvious, when they are beyond a general public perception, particular expert medical testimony is essential to sustain the connection between the criminal activity and death." *Brown*, 57 Ill. App. 3d at 531. "The length of time between the victim's initial injuries and later death has not been determinative of whether a defendant is liable for murder ***." *People v. Amigon*, 239 Ill. 2d 71, 79 (2010). The causal relationship between the defendant's acts and the victim's death "is a question of fact which should be left to the trier of fact [citation], and we will not disturb this verdict unless the evidence is so unreasonable, improbable, and unsatisfactory as to leave a reasonable doubt as to defendant's guilt." *Brackett*, 117 Ill. 2d at 177.

¶ 37    At trial, Dr. Arunkumar testified that the gunshot wound Rozelle suffered caused paraplegia and the medical treatment of his injuries created entry points through which a bacterial infection could enter and cause pneumonia. Dr. Arunkumar testified that the muscles in Rozelle's legs were wasting away because his legs were paralyzed from the gunshot wound. Dr. Arunkumar identified various possible entry points for the pneumonia infection including a

linear scar due to a chest tube placed to drain the blood from Rozelle's chest cavity necessitated by the gunshot wound; a linear scar on the abdomen with sutures or staples placed during surgery; a circular scar closer to the linear scar due to the gunshot wound; and a second more irregular circular scar possibly for a draining tube placed in the abdomen. She learned Rozelle had pneumonia from his medical records and testified as to its likely cause stating, "He had paraplegia due to the gunshot wound. He had developed some sacral decubitus ulcers. He had an indwelling Foley catheter or a urinary catheter, *** and he had the scarring in the abdomen. He had the chest tube placed in the chest which would have caused some scarring there." Dr. Arunkumar's direct examination continued:

> "Q. So would it be fair to say that because Brandon Rozelle had suffered a gunshot wound, that caused him to have this pneumonia?
>
> A. Yes.
>
> Q. Okay. And again, why would that be fair to say?
>
> A. It is a complication of a gunshot wound to the abdomen that caused the paraplegia. So, you know, he's not able to move around much. He's a 19-year old, and he has a catheter that needs to be placed. And since he's not able to move much, he started developing pressure ulcers on his lower back. He then develops pneumonia. He's also noted to have fevers in the hospital. His blood cultures, I don't have the actual results, but initially came back positive, so these would result from the complications of being shot in the abdomen a month and a half earlier."

¶ 38    The doctor further testified on direct examination that the pneumonia caused by the gunshot was the victim's cause of death as follows:

"Q. Now, based on your review of the records in this case, did you form your own opinion to a reasonable degree of medical certainty as to the cause of death of Brandon Rozelle?

A. Yes.

Q. And what was your opinion?

A. The cause of death was due to pneumonia, due to the gunshot wound to the abdomen."

¶ 39    Jemison cites *Brown* as dispositive; however, we disagree this case supports his argument that the medical expert testimony was insufficient. In *Brown*, the defendant appealed her murder conviction contending the State failed to establish, beyond a reasonable doubt, the victim's death was caused by the defendant's actions. *Brown*, 57 Ill. App. 3d at 530. The defendant stabbed the victim several times about the arms, chest, and stomach, requiring the victim to undergo surgery. *Id.* The victim was discharged from the hospital, her condition having greatly improved, but 11 days after the stabbing, she experienced discomfort because a wound opened. *Id.* The victim was ultimately readmitted to the hospital's intensive care unit where she died from a massive pulmonary embolism—the lodging of blood clots in the main vessels of the lung. *Id.* At trial, the State presented testimony from the treating surgeon to prove the defendant caused the victim's death. No autopsy was performed. The surgeon testified that he "surmised that the blood clots originated from the site of [the stabbing] injury" having "ruled out the abscess [*sic*] of varicose [*sic*] veins[.]" *Id.* at 531. The surgeon further testified blood clots originating from a wound can travel through the blood vessels and settle in the lungs but also "acknowledged that a person in a healthy condition with no injuries or history of heart trouble could die of a pulmonary embolism." *Id.* The court found the surgeon's testimony insufficient to establish "the essential

12

causative relationship between the wounds and the death of [the victim] from a pulmonary embolism 11 days later" because it lacked "foundations of fact and reasons upon which the opinion [that the stabbing was a contributing cause of death from pulmonary embolism] could stand[.]" *Id.* at 532. The court concluded that, "Without such underpinnings however, [the evidence] is incomplete." *Id.*

¶ 40      In *Brown*, this court explained that the medical expert's opinion " '*surmis[ing]* that the blood clots' which developed into the death of [the victim] 'originated from the site injury ***' " would have been sufficient to relate the wounds caused by the defendant to the victim's death had it been "coupled with foundations of fact and reasons upon which the opinion could stand." (Emphasis added.) *Id.*

¶ 41      Here, such foundations of fact and reasons upon which the opinion could stand were provided by Dr. Arunkumar. As noted above, Dr. Arunkumar testified about Rozelle's positive blood culture indicating bacteria was in his blood, the high fever that he suffered in the hospital, decubitus ulcers, and the indwelling catheter all making bacterial pneumonia more probable. She also testified that the gunshot wound Rozelle suffered caused paraplegia and the medical treatment of his injuries created entry points through which a bacterial infection could enter and cause pneumonia including a linear scar due to a chest tube placed to drain the blood from Rozelle's chest cavity necessitated by the gunshot wound; a linear scar on the abdomen with sutures or staples placed during surgery; a circular scar closer to the linear scar due to the gunshot wound; and a second more irregular circular scar possibly for a draining tube placed in the abdomen.

¶ 42      Further, Dr. Arunkumar testified credibly she could not rule out a viral source for Rozelle's pneumonia because no viral culture was taken in the hospital or at the autopsy. She

also testified Rozelle "had a number of possibilities of getting the infection in his lung because of the fact that he was paralyzed ***."

¶ 43    Jemison also cites *Amigon* to support his case where sufficient causation was found. In *Amigon*, the defendant challenged his murder conviction where the victim sustained a gunshot wound resulting in quadriplegia and then death five years later from pneumonia. *Amigon*, 239 Ill. 2d at 77. The defendant argued the State failed to prove beyond a reasonable doubt that the shot he fired, resulting in the victim's quadriplegia, was the cause of the victim's subsequent death from pneumonia. *Id.* Our supreme court disagreed with the defendant, explaining that sufficient evidence existed to support the jury's conclusion that "causation existed beyond a reasonable doubt." *Id.* at 83. The court found that in viewing the evidence in the light most favorable to the State, a reasonable jury could have come to this conclusion based on the medical expert's testimony. *Id.* The court highlighted the expert's testimony connecting the gunshot injury to the victim's ultimate death from pneumonia, her determination that the victim " 'died as a result of pneumonia due to a gunshot wound to the neck,' " and her opinion that "within a reasonable degree of medical and scientific certainty, [the victim's] death was a homicide despite the time that had elapsed since his initial gunshot injury." *Id.* at 81. The court noted factual support underlying her expert opinions, including extensive testimony about the victim's degree of medical wasting due to his paraplegia resulting in a compromised immune system and testimony that the victim's gunshot injury severely damaged his spinal cord impairing his ability to breathe making him more susceptible to pneumonia. *Id.* at 80-83. Defendant argues here, unlike *Amigon*, "there was no evidence presented that, had the pneumonia been caused by a virus rather than a bacterial infection, the paralysis would have nevertheless been a contributing factor in [Rozelle's] death."

14

¶ 44     There is no question that the expert testimony in *Amigon* was extensive; however, this does not render the expert causation testimony in this case insufficient. Unlike *Amigon* where the death from pneumonia was tied to the victim's wasting from paraplegia weakening the immune system, here, Dr. Arunkumar tied Rozelle's death from pneumonia to the various injuries he sustained as a direct result of the gunshot and resulting paraplegia. Dr. Arunkumar supported her conclusion that Rozelle's pneumonia was caused by the various injuries to his body which were directly tied to Rozelle having been shot by Jemison. She testified the pneumonia was likely bacterial pneumonia and cited support for this opinion to include Rozelle's positive blood cultures.

¶ 45     Jemison also argues *People v. Kent*, 111 Ill. App. 3d 733 (1988), is instructive. In *Kent*, the defendant, who was convicted of murdering her 4-month-old daughter by feeding the child alcoholic beverages, appealed arguing the evidence was "insufficient to prove beyond a reasonable doubt that defendant's acts were the cause of death." *Id.* at 733-34, 738. This court agreed, reasoning: (1) all the expert witnesses agreed that three other causes unrelated to the alcohol the defendant fed the victim could have resulted in the death; (2) the low level of ethanol found in the victim's muscle specimen was not proven to be the result of alcohol consumption; (3) there was no evidence establishing the quantity of alcohol given to the victim; and (4) proper procedures to eliminate the possibility of contamination of the victim's muscle specimen containing ethanol from which the cause of death was concluded were not followed such that the cause of death determination was mere conjecture. *Id.* at 739. Thus, this court concluded "the evidence that death was caused by a criminal agency is so unsatisfactory that we are compelled to reverse the finding of guilt." *Id.* at 739.

¶ 46    As *Kent* instructs, "guilt must be so established as to exclude reasonable hypotheses of innocence." *Id.* at 738. Here, unlike in *Kent*, where the experts testified to several plausible explanations of the victim's death wholly unrelated to the defendant's criminal behavior, we find Dr. Arunkumar's testimony excluded any reasonable hypotheses disconnected from the shooting and resulting paraplegia that would explain this death.

¶ 47    Finally, even if we assume the pneumonia was caused by a virus, we believe a jury of layman could reasonably determine the shooting was a contributing cause of Rozelle's death because a viral component does not necessarily rule out the presence of a simultaneous bacterial infection as indicated by the positive blood culture. When viewing the testimony of Dr. Arunkumar as a whole and in the light most favorable to the State, we conclude that the evidence is sufficient to prove defendant's actions were a contributing cause of Rozelle's death. See *Amigon*, 239 Ill. 2d at 83. Accordingly, there was sufficient evidence to support the jury's verdict.

¶ 48                        Involuntary Manslaughter Instruction

¶ 49    Jemison next argues that the trial court committed reversible error by denying his request that the jury be instructed on involuntary manslaughter. Based on the record before us, we cannot say the trial court abused its discretion by not instructing the jury on involuntary manslaughter. See *McDonald*, 2016 IL 118882, ¶ 42 (reviewing for an abuse of discretion a trial court's determination there was insufficient evidence to justify the giving of a jury instruction).

¶ 50    "[T]he appropriate standard for determining whether a defendant is entitled to a jury instruction on a lesser-included offense is whether there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense, not whether there is *some credible* evidence." (Emphasis in original.) *McDonald*, 2016 IL 118882, ¶ 25. "Where some

evidence supports the instruction, the circuit court's failure to give the [involuntary manslaughter] instruction constitutes an abuse of discretion." *People v. Castillo*, 188 Ill. 2d 536, 540 (1999). However, weighing the credibility of that evidence is a task for the jury. *People v. Beasley*, 2014 IL App (4th) 120774, ¶ 25.

¶ 51        "The difference between first degree murder and involuntary manslaughter lies in the defendant's mental state." *McDonald*, 2016 IL 118882, ¶ 25. First degree murder is committed when the defendant kills an individual without lawful justification and knows that his acts create a strong probability of death or great bodily harm, while involuntary manslaughter is committed when the defendant performs acts that are likely to cause death or great bodily harm to another and he performs those acts recklessly. *People v. Sipp*, 378 Ill. App. 3d 157, 163 (2008). " 'Certain factors *may* suggest whether a defendant acted recklessly and whether an involuntary manslaughter instruction is appropriate: disparity in size and strength between the defendant and the victim, the severity of the victim's injuries, whether the defendant used his bare fists or a weapon, whether there were multiple wounds, or whether the victim was defenseless.' " (Emphasis added.) *Id.* at 164 (quoting *People v. Eason*, 326 Ill. App. 3d 197, 209 (2001)). An involuntary manslaughter instruction should be given even where the defense theory is based on "slight" evidence of reckless conduct. *Id.* However, " 'when the defendant intends to fire a gun, points it in the general direction of his or her intended victim, and shoots, such conduct is not merely reckless' " to warrant an involuntary manslaughter instruction. *Id.* (quoting *People v. Jackson*, 372 Ill. App. 3d 605, 613-14 (2007)). Nor is a defendant's testimony that he did not intend to kill anyone sufficient to warrant an involuntary manslaughter instruction when that mental state is "only known to him and unsupported by the facts." *Id.*

17

¶ 52    Jemison argues he was entitled to an involuntary manslaughter instruction because he did not know the gun was in firing condition, he did not intentionally pull the trigger, and he only wanted to scare the victim. We disagree.

¶ 53    Jemison's own testimony is most damning. He testified he understood the purpose of a gun was to shoot and acknowledged that is why people fear guns. He bought the gun for protection because he had recently been shot. He knew there were bullets in the magazine of the gun. Two days before the incident, he showed friends how to eject the magazine using a button on the gun. And on the date of the shooting, he pointed the loaded gun at Rozelle, who was unarmed with his shoulders outstretched, and he pulled the trigger.

¶ 54    Jemison's claimed ignorance about the gun's mechanics lends no support to a theory of reckless conduct. Jemison testified he did not know if there was a bullet chambered when he pointed the gun at Rozelle. Although he did not believe the gun was ready to fire, he explained, "I am not going to tell you it could have been [ready to fire]. I am not going to tell you it couldn't have been [ready to fire]. That was my first time ever with a gun, so I can't sit up here and tell you that answer." Because he could not say whether the gun was in "firing condition," testimony that others handled the gun a day or two before the shooting is of no consequence. Even if his friends had chambered a bullet and depressed the safety, this would not have registered to Jemison as one less step to put the gun in firing condition. In fact, Jemison acknowledged on cross-examination that he never paid attention to the safety.

¶ 55    Although pointing a loaded weapon at another individual is a gross deviation from the standard of care exercised by a reasonable person and thus reckless (see *People v. Andersch*, 107 Ill. App. 3d 810, 818 (1982)), an involuntary manslaughter instruction is not warranted where the evidence shows Jemison intended to fire a gun, pointed it at Rozelle, and pulled the trigger; that

conduct is more than mere recklessness (see *Sipp*, 378 Ill. App. 3d at 164). Jemison's testimony that he did not intend to shoot Rozelle is not a sufficient basis for instructing the jury on involuntary manslaughter. See *Jackson*, 372 Ill. App. 3d at 614 (quoting *People v. Cannon*, 49 Ill. 2d 162, 166 (1971) ("testimony that he did not intend to kill anyone does not provide a sufficient basis for instructing on involuntary manslaughter")).

¶ 56    This case is not, as defendant argues, analogous to the situation in *People v. Cole*, 253 Ill. App. 3d 603 (1993). In *Cole*, the issue was whether the defendant could be found guilty of involuntary manslaughter on a theory of accountability under the common design rule. *Id*. at 606. The appellate court affirmed the defendant's involuntary manslaughter conviction despite the shooter's mistaken belief that the next round in the revolver was empty when it was fired, killing the victim. *Id.* at 608-612. Here, as explained above, Jemison had no such mistaken belief, and his gun was not a revolver.

¶ 57    We also find Jemison's reliance on *People v. Murray* distinguishable. In *Murray*, 231 Ill. App. 3d 1047 (1992), like *Cole*, the issue was whether the defendant could be convicted of involuntary manslaughter, not whether there was sufficient evidence to warrant giving an involuntary manslaughter instruction to the jury. Despite the defendant's belief that the revolver was unloaded, the appellate court determined the jury could have easily found the defendant realized the revolver's hammer was cocked and deliberately pulled the trigger to release the hammer. *Id.* at 1049-50. The court affirmed the defendant's involuntary manslaughter conviction, finding that even if the defendant's assertion he did not believe the gun was loaded were believed, "there is absolutely no indication that [the defendant] made any effort to verify that the pistol was unloaded at the time he retrieved it, pointed it at his victim, and released the trigger." *Id.* at 1050. Here, Jemison knew the gun was loaded.

¶ 58    Jemison's reliance on *People v. Beasley* is equally misplaced. In *Beasley*, 2014 IL App (4th) 120774, ¶¶ 23-25, the appellate court found the trial court abused its discretion by failing to give an involuntary manslaughter instruction where the jury could have rationally accepted the defendant acted recklessly with no intent to shoot the victim. The evidence arguably showed the defendant had a dispute with the victim and thought the victim was going to hurt him. *Id.* ¶ 25. The defendant pointed his gun at the crowd where the victim was and shot him in the back. *Id.* Yet the testimonies of the defendant and other witnesses suggested the gun went off accidentally or was a reaction to his heightened sense of fear. *Id.*

¶ 59    Here, nothing in the record aside from Jemison's own testimony arguably supports his assertion that he did not intend to shoot Rozelle. Even then, defendant's testimony is contradictory. Jemison testified that he did not recall pulling the trigger. If he cannot recall pulling the trigger, he cannot argue that doing so was unintentional. Additionally, the fact that some evidence could be viewed as consistent with Jemison's claim that he did not intend to fire the gun—namely the jammed slide, which the expert testified could be caused by a person holding the gun loosely—is not sufficient to warrant giving an involuntary manslaughter instruction. The expert offered several plausible explanations for the jam and did not state that any one was more likely to have occurred. And even if the jammed slide was caused by Jemison holding the gun loosely, that is just as easily explained by his testimony that he never fired a gun before and was not prepared for its recoil when fired.

¶ 60    We are unpersuaded by Jemison's argument that he was entitled to an involuntary manslaughter instruction because he only intended to scare Rozelle. He was asked twice on cross examination if he pulled the trigger to scare Rozelle. Rather than answering affirmatively, Jemison replied both times, "It all happened quick." Given the dearth of evidence of

recklessness, we find that the trial court did not abuse its discretion in denying Jemison's request for an involuntary manslaughter instruction. See *McDonald*, 2016 IL 118882, ¶ 57.

¶ 61                    2016 Amendment to Juvenile Court Act's Automatic Transfer Provision

¶ 62          Alternatively, Jemison argues his case should be remanded for resentencing because the trial court incorrectly concluded the 2016 amendment to the Juvenile Court Act's automatic transfer provision did not apply to him. His request for relief "is that his sentence be vacated and his case remanded to *adult* court for proceedings under section 5-130(1)(c)(ii) where the State would have an opportunity to seek a hearing on whether he should be subject to adult sentencing."

¶ 63          After the parties submitted their briefs in this appeal, this court issued its decision in *People v. Clark*, 2020 IL App (1st) 182533, ¶¶ 68-76, which found the 2016 amendment retroactively applied to the defendant who had yet to be sentenced when the amendment became effective. This court further found that where a defendant is over 21 years of age and no longer under the authority of the Juvenile Court Act, the appropriate remedy is to vacate the defendant's sentence and remand the cause to the trial court to give the State an opportunity to file a petition for adult sentencing. *Clark*, 2020 IL App (1st) 182533, ¶¶ 82-86.

¶ 64          We ordered the parties to submit supplemental briefs discussing what effect *Clark* has on Jemison's arguments. In their supplemental briefs, the parties agree that *Clark* is instructive and that the same remedy should obtain here. We agree.

¶ 65          Here, as in *Clark*, the 2016 amendment applies retroactively to Jemison because he had not yet been sentenced when the amendment became effective. *Clark*, 2020 IL App (1st) 182533, ¶¶ 68-76. Because Jemison is over 21 years of age, we vacate his sentence and remand the cause to the trial court where the State will have the opportunity to file a petition for adult sentencing

under section 5-130(1)(c)(ii) of the Act. *Id.* ¶¶ 82-86. Given our remand, we need not address Jemison's remaining alternative claims.

¶ 66                                    CONCLUSION

¶ 67        Accordingly, we affirm defendant's conviction, vacate his sentence, and remand to the trial court with directions.

¶ 68        Affirmed in part; vacated in part; and remanded with directions.